**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

GENIE INVESTMENTS NV INC., Case No.: 3:24-bk-00496-BAJ

Debtor. Chapter 7
_______________________________________/

AARON R. COHEN, Chapter 7 Trustee,

Adversary Proceeding No. ___________

Plaintiff,

v.

ZOOMERAL, INC., a Delaware corporation, CAPITULUM, LLC, a New York limited liability company, CALD HOLDINGS, LLC, a Florida limited liability company, GENIE INVESTMENTS II, LLC, a Delaware limited liability company, BETTER METHODS, LLC, a Wyoming limited liability company, and GENIE'S ANGELS, LLC n/k/a MERKTON GROUP, LLC, a Delaware limited liability company,

Defendants.
_______________________________________/

**COMPLAINT TO AVOID AND RECOVER**
**<u>FRAUDULENT TRANSFERS OF PROPERTY</u>**

Aaron R. Cohen, Chapter 7 Trustee, (the "<u>Trustee</u>") of the bankruptcy estate of Genie Investments NV, Inc., by and through undersigned counsel, hereby sues Defendants, Zoomeral Inc., Capitulum, LLC, Cald Holdings, LLC, Genie Investments II, LLC, Better Methods, LLC, and Genie's Angels, LLC n/k/a Merkton Group, LLC, to avoid and recover the transfer of certain property, pursuant to 11 U.S.C. § 548 and in support thereof says:

## Jurisdiction and Venue

1. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

## PARTIES

4. On February 21, 2024 (the "Petition Date"), Genie Investments NV Inc. (the "Debtor") filed a Voluntary Petition for Relief (Doc. 1) under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, in the case styled *In re Genie Investments NV Inc.*, Case No: 3:24-bk-00496-BAJ (the "Bankruptcy Case").

5. On August 12, 2024, the Bankruptcy Case was converted to a Chapter 7 liquidation case and the Trustee was appointed to administer the Debtor's estate (Doc. 207).

6. On the Petition Date, the Debtor was owned by John Cohan ("Cohan") and David Hughes ("Hughes"). Prior to the Petition Date, Caleb Davis ("Davis") also had an ownership interest in the Debtor.

7. Zoomeral, Inc. ("Zoomeral") is a Delaware corporation owned by Cohan and Hughes.

8. Capitulum, LLC ("Capitulum") is a New York limited liability company owned by Cohan.

9. Cald Holdings, LLC ("Cald") is a Florida limited liability company owned by Davis.

10. Genie Investments II, LLC ("Genie II") is a Delaware limited liability company owned by Cohan and Hughes.

11. Better Methods, LLC ("Better Methods") is a Wyoming limited liability company owned by Cohan and Hughes.

12. Genie Angels, LLC, ("Genie's Angels") which is now known as the Merkton Group, LLC, is a Delaware limited liability company owned by Cohan and Hughes.

## Factual Background

**A.** ***Transfers to Zoomeral***

13. On September 5, 2022, the Debtor entered into a Loan Agreement (the "Zoomeral Loan Agreement") with Zoomeral for a loan (the "Zoomeral Loan") of up to $3 million by the Debtor to Zoomeral. A copy of the Zoomeral Loan Agreement is attached as **Exhibit A**.

14. The Zoomeral Loan Agreement provides that the Zoomeral Loan will accrue interest at the rate of only .1% per year and that the loan would be repaid in the form of one balloon payment on December 5, 2029.

15. The Loan Agreement also grants to Zoomeral the sole right to extend the term of the Loan for an additional 10 years.

16. The Zoomeral Loan is unsecured with no collateral securing the loan.

17. Hughes signed the Zoomeral Loan Agreement on behalf of Zoomeral and Cohan signed the Zoomeral Loan Agreement on behalf of the Debtor.

18. On its initial Statement of Financial Affairs (Doc. 40) ("SOFA") the Debtor stated that it had transferred $1,900,000 to Hughes/Zoomeral in 2023 for "loan/compensation to David Hughes as Director."

19. On its Amended Statement of Financial Affairs (Doc. 61) ("Amended SOFA"), the Debtor stated that it transferred $1,380,590.24 to Zoomeral for "loan to insider corporation."

20. According to the Chapter 11 Examiner's Report (Doc. 146) (the "Examiner's Report"), which was based on a review of the Debtor's bank records, the Debtor transferred a net total of $1,771,555.74 (the "Zoomeral Transfers") to Zoomeral from September 12, 2022 through July 28, 2023 which may not include all amounts transferred by the Debtor to Zoomeral.

**B. *Transfers to Capitulum***

21. On September 5, 2022, the Debtor entered into a Loan Agreement (the "Capitulum Loan Agreement") with Capitulum for a loan (the "Capitulum Loan") of up to $1.5 million by the Debtor to Capitulum. A copy of the Capitulum Loan Agreement is attached as **Exhibit B**.

22. The Capitulum Loan Agreement provides that the Capitulum Loan will accrue interest at the rate of only .1% per year and that the loan would be repaid in the form of one balloon payment on December 5, 2029.

23. The Loan Agreement also grants to Capitulum the sole right to extend the term of the Loan for an additional 10 years.

24. The Capitulum Loan is unsecured with no collateral securing the loan.

25. Cohan signed the Capitulum Loan Agreement on behalf of Capitulum and Hughes signed the Capitulum Loan Agreement on behalf of the Debtor.

26. On its SOFA, the Debtor stated that it had transferred $500,000 to "John Cohan/Capitulo" in 2023 for "loan/compensation to John Cohan as Director."

27. On its Amended SOFA, the Debtor stated that it transferred $517,409.70 to Capitulum for "loan to insider corporation."

28. According to the Examiner's Report, which was based on a review of the Debtor's bank records, the Debtor transferred a net total of $517,109.87 (the "Capitulum Transfers") to Capitulum from September 16, 2022 through July 28, 2023 which may not include all amounts transferred by the Debtor to Capitulum.

**C. *Transfers to Cald***

29. On September 5, 2022, the Debtor entered into a Loan Agreement (the "Cald Loan Agreement") with Cald for a loan (the "Cald Loan") of up to $1.5 million by the Debtor to Cald. A copy of the Cald Loan Agreement is attached as **Exhibit C**.

30. The Cald Loan Agreement provides that the Loan will accrue interest at the rate of only .1% per year and that the Loan would be repaid in the form of one balloon payment on December 5, 2029.

31. The Loan Agreement also grants to Cald the sole right to extend the term of the Loan for an additional 10 years.

32. The Cald Loan is unsecured with no collateral securing the loan.

33. Davis signed the Cald Loan Agreement on behalf of Cald and Cohan signed on behalf of the Debtor.

34. On its SOFA, the Debtor stated that it had transferred $500,000 to Cald/Davis in 2023 for "loan/compensation to Caleb Davis as former director."

35. On its Amended SOFA, the Debtor stated that it transferred $516,358.87 to Cald for "loan to insider corporation controlled by Former Director."

36. According to the Chapter 11 Examiner's Report, which was based on a review of the Debtor's bank records, the Debtor transferred a net total of $517,108.87 (the "Cald Transfers")

to Cald from September 16, 2022 through July 28, 2023 which may not include all amounts transferred by the Debtor to Cald.

37. At the time of the Cald Loan Agreement and Cald Transfers, Davis was an owner and officer of the Debtor.

**D. *Transfers to Genie II***

38. On August 15, 2023, the Debtor entered into a Loan Agreement with Genie II (the "Genie II Loan Agreement") for a loan (the "Genie II Loan") of up to $2 million by the Debtor to Genie II. A copy of the Genie II Loan Agreement is attached as **Exhibit D**.

39. The Genie II Loan Agreement provides that the Loan will accrue interest at the rate of only .1% per year and that the Loan would be repaid in the form of one balloon payment on August 15, 2030.

40. The Genie II Loan Agreement also grants to Genie II the sole right to extend the term of the Loan for an additional 10 years.

41. The Genie II Loan is unsecured with no collateral securing the loan.

42. Cohan signed the Genie II Loan Agreement on behalf of Genie II and Hughes signed on behalf of the Debtor.

43. On its Amended SOFA, the Debtor stated that it transferred $1,085,073.37 to Genie II for "loan to insider corporation."

44. According to the Examiner's Report, which was based on a review of the Debtor's bank records, the Debtor transferred a total of $1,244,606.44 (the "Genie II Transfers") to Genie II from September 20, 2023 through January 4, 2024 which may not include all amounts transferred by the Debtor to Genie II.

45. Additionally, certain of the Debtor's customers wired funds to Genie II's bank account for prepaid interest owed to the Debtor totaling $516,550 (the "Genie II Customer Deposits").

46. Genie II transferred $508,000 to the Debtor, leaving a total of $8,550 of the Genie II Customer Deposits still owed to the Debtor (the "Outstanding Genie II Customer Deposits").

**E. *Transfers to Better Methods***

47. On January 3, 2023, the Debtor entered into a Loan Agreement with Better Methods (the "Better Methods Loan Agreement") for a loan (the "Better Methods Loan") of up to $500,000 by the Debtor to Better Methods. A copy of the Better Methods Loan Agreement is attached as **Exhibit E**.

48. The Better Methods Loan Agreement provides that the Better Methods Loan will accrue interest at the rate of only .1% per year and that the loan would be repaid in the form of one balloon payment on January 3, 2030.

49. The Better Methods Loan Agreement also grants to Better Methods the sole right to extend the term of the loan for an additional 10 years.

50. The Better Methods Loan is unsecured with no collateral securing the loan.

51. Cohan signed the Better Methods Loan Agreement on behalf of Better Methods and Hughes signed on behalf of the Debtor.

52. On its Amended SOFA, the Debtor stated that it transferred $81,250.00 to Better Methods for "insider corporation loan."

53. According to the Examiner's Report, which was based on a review of the Debtor's bank records, the Debtor transferred a net total of $130,000 (the "Better Methods Transfers") to

Better Methods prior to the Petition Date which may not include all amounts transferred by the Debtor to Better Methods.

**F.** ***Transfers to Genie's Angels***

54. On June 1, 2023, the Debtor entered into a Loan Agreement with Genie's Angels (the "Genie's Angels Loan Agreement") for a loan (the "Genie's Angels Loan") of up to $50,000 by the Debtor to Genie's Angels. A copy of the Genie's Angels Loan Agreement is attached as **Exhibit F**.

55. The Genie's Angels Loan Agreement provides that the Genie's Angels Loan will accrue interest at the rate of only .1% per year and that the Loan would be repaid in the form of one balloon payment on June 1, 2030.

56. The Loan Agreement also grants to Genie's Angels the sole right to extend the term of the Loan for an additional 10 years.

57. The Genie's Angels Loan is unsecured with no collateral securing the loan.

58. Cohan signed the Genie's Angels Loan Agreement on behalf of Genie's Angels and Hughes signed on behalf of the Debtor.

59. On its Amended SOFA, the Debtor stated that it transferred $25,000.00 to Genie's Angels for "loan to insider corporation."

60. According to the Debtor's bank records, the Debtor transferred $25,000 to Genie's Angels on June 9, 2023.

61. All conditions precedent to the filing of this action have occurred or have been waived.

**Count I**
**(Constructive Fraudulent Transfer Against Zoomeral)**

62. The allegations contained in paragraphs 1-7, 13-20 and 61 are realleged and incorporated by reference herein.

63. 11 U.S.C. § 548 provides in relevant part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation … [.]

*See* 11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(I).

64. The Zoomeral Loan was not an arms length, commercially reasonable loan that Zoomeral could have obtained from an unrelated third party.

65. The terms of the Zoomeral Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral ability of Zoomeral to extend the loan term, and the lack of collateral security for the loan are not terms that Zoomeral could have obtained from an unrelated third party.

66. Rather than a being commercially reasonable loan, the Zoomeral Transfers were, in fact, transfers to the Debtor's insiders for less than reasonably equivalent value.

67. The Debtor was insolvent at the time of the Zoomeral Transfers or became insolvent as a result of such transfers.

68. The Zoomeral Transfers were made within two years before the date of the filing of the Petition.

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Zoomeral, Inc. (i) declaring the Zoomeral Transfers to be fraudulent transfers, (ii) avoiding the Zoomeral Transfers and any other rights, funds or property of the Debtor fraudulently transferred to Zoomeral within two years of the Petition Date, (iii) granting a money judgment against Defendant Zoomeral, Inc. for the value of the Zoomeral Transfers; and (iv) granting such other and further relief as the Court deems just and proper.

**Count II**
**(Actual Fraudulent Transfer Against Zoomeral)**

69. The allegations contained in paragraphs 1-7, 13-20 and 61 are realleged and incorporated by reference herein.

70. 11 U.S.C. § 548(a)(1)(A) provides in relevant part:

> (a) (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

71. The Zoomeral Loan was not an arms length, commercially reasonable loan that Zoomeral could have obtained from an unrelated third party.

72. The terms of the Zoomeral Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral ability of Zoomeral to extend the loan terms, and the lack of collateral security for the loan are not terms that Zoomeral could have obtained from an unrelated third party.

73. Rather than being a commercially reasonable loan, the Zoomeral Transfers were, in fact, made with the actual intent to hinder, delay or defraud present and future creditors.

74. Pursuant to § 550(a), the recovery of property for the benefit of the Debtor's estate is authorized to the extent the Transfers are avoided under § 548(a)(1)(B).

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Zoomeral, Inc. (i) declaring the Zoomeral Transfers to be fraudulent transfers, (ii) avoiding the Zoomeral Transfers and any other rights, funds or property of the Debtor fraudulently transferred to Zoomeral within two years of the Petition Date, (iii) granting a money judgment against the Defendant Zoomeral, Inc. for the value of the Zoomeral Transfers; and (iv) granting such other and further relief as the Court deems just and proper.

## Count III
## (Constructive Fraudulent Transfer Against Capitulum)

75. The allegations contained in paragraphs 1-6, 8, 21-28 and 61 are realleged and incorporated by reference herein.

76. 11 U.S.C. § 548 provides in relevant part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation … [.]

*See* 11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(I).

77. The Capitulum Loan was not an arms length, commercially reasonable loan that Capitulum could have obtained from an unrelated third party.

78. The terms of the Capitulum Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral ability of Capitulum to extend the loan term, and the lack of collateral security for the loan are not terms that Capitulum could have obtained from an unrelated third party.

79. Rather than a being commercially reasonable loan, the Capitulum Transfers were, in fact, transfers to an insider of the Debtor for less than reasonably equivalent value.

80. The Debtor was insolvent at the time of the Capitulum Transfers or became insolvent as a result of such transfers.

81. The Capitulum Transfers were made within two years before the date of the filing of the Petition.

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Capitulum, LLC (i) declaring the Capitulum Transfers to be fraudulent transfers, (ii) avoiding the Capitulum Transfers and any other rights, funds or property of the Debtor fraudulently transferred to Capitulum within two years of the Petition Date, (iii) granting a money judgment against Defendant Capitulum, LLC for the value of the Capitulum Transfers; and (iv) granting such other and further relief as the Court deems just and proper.

**Count IV**
**(Actual Fraudulent Transfer Against Capitulum)**

82. The allegations contained in paragraphs 1-6, 8, 21-28 and 61 are realleged and incorporated by reference herein.

83. 11 U.S.C. § 548(a)(1)(A) provides in relevant part:

> (a) (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

84. The Capitulum Loan was not an arms length, commercially reasonable loan that Capitulum could have obtained from an unrelated third party.

85. The terms of the Capitulum Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral ability of Capitulum to extend the loan terms, and the lack of collateral security for the loan are not terms that Capitulum could have obtained from an unrelated third party.

86. Rather than being a commercially reasonable loan, the Capitulum Transfers were, in fact, made with the actual intent to hinder, delay or defraud present and future creditors.

87. Pursuant to § 550(a), the recovery of property for the benefit of the Debtor's estate is authorized to the extent the Transfers are avoided under § 548(a)(1)(B).

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Capitulum, LLC (i) declaring the Capitulum Transfers to be fraudulent transfers, (ii) avoiding the Capitulum Transfers and any other rights, funds or property of the Debtor fraudulently transferred to Capitulum within two years of the Petition Date, (iii) granting a money judgment against the Defendant Capitulum, LLC for the value of the Capitulum Transfers; and (iv) granting such other and further relief as the Court deems just and proper.

**<u>Count V</u>**
**(Constructive Fraudulent Transfer Against Cald)**

88. The allegations contained in paragraphs 1-6, 9, 29-37, and 61 are realleged and incorporated by reference herein.

89. 11 U.S.C. § 548 provides in relevant part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation … [.]

*See* 11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(I).

90. The Cald Loan was not an arms length, commercially reasonable loan that Cald could have obtained from an unrelated third party.

91. The terms of the Cald Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral ability of Cald to extend the loan term, and the lack of collateral security for the loan are not terms that Cald could have obtained from an unrelated third party.

92. Rather than a being commercially reasonable loan, the Cald Transfers were, in fact, transfers to an insider of the Debtor for less than reasonably equivalent value.

93. The Debtor was insolvent at the time of the Cald Transfers or became insolvent as a result of such transfers.

94. The Cald Transfers were made within two years before the date of the filing of the Petition.

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Cald Holdings, LLC (i) declaring the Cald Transfers to be fraudulent transfers, (ii) avoiding the Cald Transfers and any other rights, funds or property of the Debtor fraudulently transferred to Cald within two years of the Petition Date, (iii) granting a money judgment against Defendant Cald Holdings, LLC for the value of the Cald Transfers; and (iv) granting such other and further relief as the Court deems just and proper.

**Count VI**
**(Actual Fraudulent Transfer Against Cald)**

95. The allegations contained in paragraphs 1-6, 9, 29-37, and 61 are realleged and incorporated by reference herein.

96. 11 U.S.C. § 548(a)(1)(A) provides in relevant part:

> (a) (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

97. The Cald Loan was not an arms length, commercially reasonable loan that Cald could have obtained from an unrelated third party.

98. The terms of the Cald Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral ability of Cald to extend the loan terms, and the lack of collateral security for the loan are not terms that Cald could have obtained from an unrelated third party.

99. Rather than being a commercially reasonable loan, the Cald Transfers were, in fact, made with the actual intent to hinder, delay or defraud present and future creditors.

100. Pursuant to § 550(a), the recovery of property for the benefit of the Debtor's estate is authorized to the extent the Transfers are avoided under § 548(a)(1)(B).

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Cald Holdings, LLC (i) declaring the Cald Transfers to be fraudulent transfers, (ii) avoiding the Cald Transfers and any other rights, funds or property of the Debtor fraudulently transferred to Cald within two years of the Petition Date, (iii) granting a money judgment against the Defendant Cald Holdings, LLC for the value of the Cald Transfers; and (iv) granting such other and further relief as the Court deems just and proper.

## Count VII
## (Constructive Fraudulent Transfer Against Genie II)

101. The allegations contained in paragraphs 1-6, 10, 38-46, and 61 are realleged and incorporated by reference herein.

102. 11 U.S.C. § 548 provides in relevant part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation … [.]

*See* 11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(I).

103. The Genie II Loan was not an arms length, commercially reasonable loan that Genie II could have obtained from an unrelated third party.

104. The terms of the Genie II Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral ability of Genie II to extend the loan term, and the lack of collateral security for the loan are not terms that Genie II could have obtained from an unrelated third party.

105. Rather than a being commercially reasonable loan, the Genie II Transfers were, in fact, transfers to the Debtor's insiders for less than reasonably equivalent value.

106. Additionally, the Outstanding Genie II Customer Deposits were transfers to Genie II for less than reasonably equivalent value.

107. The Debtor was insolvent at the time of the Genie II Transfers or became insolvent as a result of such transfers.

108. The Genie II Transfers were made within two years before the date of the filing of the Petition.

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Genie Investments II, LLC (i) declaring the Genie II Transfers and the Outstanding Genie II Customer Deposits to be fraudulent transfers, (ii) avoiding the Genie II Transfers, the Outstanding Genie II Customer Deposits, and any other rights, funds or property of the Debtor fraudulently transferred to Genie II within two years of the Petition Date, (iii) granting a money judgment against Defendant Genie Investments II, LLC for the value of the Genie II Transfers and the Outstanding Genie II Customer Deposits; and (iv) granting such other and further relief as the Court deems just and proper.

**<u>Count VIII</u>**
**(Actual Fraudulent Transfer Against Genie II)**

109. The allegations contained in paragraphs 1-6, 10, 38-46, and 61 are realleged and incorporated by reference herein.

110. 11 U.S.C. § 548(a)(1)(A) provides in relevant part:

> (a) (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

111. The Genie II Loan was not an arms length, commercially reasonable loan that Genie II could have obtained from an unrelated third party.

112. The terms of the Genie II Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral ability of Genie II to extend the loan terms, and the lack of collateral security for the loan are not terms that Genie II could have obtained from an unrelated third party.

113. Rather than being a commercially reasonable loan, the Genie II Transfers were, in fact, made with the actual intent to hinder, delay or defraud present and future creditors.

114. Additionally, the Outstanding Genie II Customer Deposits were made with the actual intent to hinder, delay or defraud present and future creditors.

115. Pursuant to § 550(a), the recovery of property for the benefit of the Debtor's estate is authorized to the extent the Transfers are avoided under § 548(a)(1)(B).

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Genie Investments II, LLC (i) declaring

the Genie II Transfers and the Outstanding Genie II Customer Deposits to be fraudulent transfers, (ii) avoiding the Genie II Transfers, the Outstanding Genie II Customer Deposits, and any other rights, funds or property of the Debtor fraudulently transferred to Genie II within two years of the Petition Date, (iii) granting a money judgment against the Defendant Genie II, Inc. for the value of the Genie II Transfers and the Outstanding Genie II Customer Deposits; and (iv) granting such other and further relief as the Court deems just and proper.

**Count IX**
**(Constructive Fraudulent Transfer Against Better Methods)**

116. The allegations contained in paragraphs 1-6, 11, 47-53, and 61 are realleged and incorporated by reference herein.

117. 11 U.S.C. § 548 provides in relevant part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation … [.]

*See* 11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(I).

118. The Better Methods Loan was not an arms length, commercially reasonable loan that Better Methods could have obtained from an unrelated third party.

119. The terms of the Better Methods Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral

ability of Better Methods to extend the loan term, and the lack of collateral security for the loan are not terms that Better Methods could have obtained from an unrelated third party.

120. Rather than a being commercially reasonable loan, the Better Methods Transfers were, in fact, transfers to the Debtor's insiders for less than reasonably equivalent value.

121. The Debtor was insolvent at the time of the Better Methods Transfers or became insolvent as a result of such transfers.

122. The Better Methods Transfers were made within two years before the date of the filing of the Petition.

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Better Methods, LLC (i) declaring the Better Methods Transfers to be fraudulent transfers, (ii) avoiding the Better Methods Transfers and any other rights, funds or property of the Debtor fraudulently transferred to Better Methods within two years of the Petition Date, (iii) granting a money judgment against Defendant Better Methods, LLC for the value of the Better Methods Transfers; and (iv) granting such other and further relief as the Court deems just and proper.

## **Count X**
## **(Actual Fraudulent Transfer Against Better Methods)**

123. The allegations contained in paragraphs 1-6, 11, 47-53, and 61 are realleged and incorporated by reference herein.

124. 11 U.S.C. § 548(a)(1)(A) provides in relevant part:

> (a) (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or



79804282;1

> became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

125. The Better Methods Loan was not an arms length, commercially reasonable loan that Better Methods could have obtained from an unrelated third party.

126. The terms of the Better Methods Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral ability of Better Methods to extend the loan terms, and the lack of collateral security for the loan are not terms that Better Methods could have obtained from an unrelated third party.

127. Rather than being a commercially reasonable loan, the Better Methods Transfers were, in fact, made with the actual intent to hinder, delay or defraud present and future creditors.

128. Pursuant to § 550(a), the recovery of property for the benefit of the Debtor's estate is authorized to the extent the Transfers are avoided under § 548(a)(1)(B).

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Better Methods, LLC (i) declaring the Better Methods Transfers to be fraudulent transfers, (ii) avoiding the Better Methods Transfers and any other rights, funds or property of the Debtor fraudulently transferred to Better Methods within two years of the Petition Date, (iii) granting a money judgment against the Defendant Better Methods, LLC for the value of the Better Methods Transfers; and (iv) granting such other and further relief as the Court deems just and proper.

**Count XI**
**(Constructive Fraudulent Transfer Against Genie's Angels)**

129. The allegations contained in paragraphs 1-6, 12, and 54-61 are realleged and incorporated by reference herein.

130. 11 U.S.C. § 548 provides in relevant part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation … [.]

*See* 11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(I).

131. The Genie's Angels Loan was not an arms length, commercially reasonable loan that Genie's Angels could have obtained from an unrelated third party.

132. The terms of the Genie's Angels Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral ability of Genie's Angels to extend the loan term, and the lack of collateral security for the loan are not terms that Genie's Angels could have obtained from an unrelated third party.

133. Rather than a being commercially reasonable loan, the Genie's Angels Transfers were, in fact, transfers to the Debtor's insiders for less than reasonably equivalent value.

134. The Debtor was insolvent at the time of the Genie's Angels Transfers or became insolvent as a result of such transfers.

135. The Genie's Angels Transfers were made within two years before the date of the filing of the Petition.

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Genie's Angels, LLC, now known as Merkton Group, LLC (i) declaring the Genie's Angels Transfers to be fraudulent transfers, (ii) avoiding the Genie's Angels Transfers and any other rights, funds or property of the Debtor

fraudulently transferred to Genie's Angels within two years of the Petition Date, (iii) granting a money judgment against Defendant Genie's Angels, LLC now known as Merkton Group, LLC for the value of the Genie's Angels Transfers; and (iv) granting such other and further relief as the Court deems just and proper.

## Count XII
## (Actual Fraudulent Transfer Against Genie's Angels)

136. The allegations contained in paragraphs 1-6, 12, and 54-61 are realleged and incorporated by reference herein.

137. 11 U.S.C. § 548(a)(1)(A) provides in relevant part:

> (a) (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

138. The Genie's Angels Loan was not an arms length, commercially reasonable loan that Genie's Angels could have obtained from an unrelated third party.

139. The terms of the Genie's Angels Loan with its .1% interest rate, balloon payment due seven years in the future without any intervening interest payments being made, the unilateral ability of Genie's Angels to extend the loan terms, and the lack of collateral security for the loan are not terms that Genie's Angels could have obtained from an unrelated third party.

140. Rather than being a commercially reasonable loan, the Genie's Angels Transfers were, in fact, made with the actual intent to hinder, delay or defraud present and future creditors.

141. Pursuant to § 550(a), the recovery of property for the benefit of the Debtor's estate is authorized to the extent the Transfers are avoided under § 548(a)(1)(B).

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court enter a final judgment in his favor and against Defendant Genie's Angels, LLC, now known as Merkton Group, LLC, (i) declaring the Genie's Angels Transfers to be fraudulent transfers, (ii) avoiding the Genie's Angels Transfers and any other rights, funds or property of the Debtor fraudulently transferred to Genie's Angels within two years of the Petition Date, (iii) granting a money judgment against the Defendant Genie's Angels, LLC, now known as Merkton Group, LLC, for the value of the Genie's Angels Transfers; and (iv) granting such other and further relief as the Court deems just and proper.

**Count XIII**
**(Recovery of Avoid Transfers Pursuant to 11 U.S.C. § 550 Against All Defendants)**

142. The allegations contained in paragraphs 1-141 are realleged and incorporated by reference herein.

143. Pursuant to Sections 544 and 548 of the Bankruptcy Code, the Trustee may avoid the Cald Transfers, the Capitulum Transfers, the Cald Transfers, the Genie II Transfers, the Better Methods Transfers, the Genie's Angels Transfers, and the Outstanding Genie II Customer Deposits.

144. Pursuant to § 550(a), the Trustee may recover for the benefit of the estate the Debtor's property transferred to the Defendants or the value of the Debtor's property transferred to the Defendants from the Debtor.

WHEREFORE, Aaron R. Cohen as Chapter 7 Trustee respectfully requests that the Court (i) find that Plaintiff is entitled to recover the Cald Transfers, the Capitulum Transfers, the Cald Transfers, the Genie II Transfers, the Better Methods Transfers, the Genie's Angels Transfers, and the Outstanding Genie II Customer Deposits pursuant to 11 U.S.C. § 550, (ii) enter judgment against Defendants in an amount equal to the Cald Transfers, the Capitulum Transfers, the Cald

Transfers, the Genie II Transfers, the Better Methods Transfers, the Genie's Angels Transfers, and the Outstanding Genie II Customer Deposits and (iii) for such other relief as the Court deems just.

Dated: February 6, 2025

AKERMAN LLP

By: */s/ Raye C. Elliott*

Raye C. Elliott, Esq.
Florida Bar Number: 018732
Email: raye.elliott@akerman.com
401 East Jackson Street, Suite 1700
Tampa, FL 33602
Phone: (813) 223-7333
Fax: (813) 223-2837

Attorneys for Aaron R. Cohen, Chapter 7 Trustee

# Exhibit A

# LOAN AGREEMENT

**THIS LOAN AGREEMENT (this "Agreement") dated this 5th day of September, 2022**

**BETWEEN:**

Genie Investments NV
(the "Lender")

**AND**

ZOOMERAL, Inc.
(the "Borrower")

**IN CONSIDERATION OF** the Lender loaning certain monies (the "Loan") to the Borrower, and the Borrower repaying the Loan to the Lender, both parties agree to keep, perform and fulfill the promises and conditions set out in this Agreement:

**Loan Amount & Interest**

1. The Lender promises to loan up to $3,000,000.00 (Three Million Dollars and No Cents) in the form of a non-recourse unsecured line of credit to the Borrower and the Borrower promises to repay this principal amount to the Lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance. The loan amount can increase at any time if mutually agreed upon in writing by both Borrower and Lender. The Lender shall not have the ability to decrease the loan amount at any time.

**Payment**

2. This Loan will be repaid in the form of one (1) balloon payment due on December 5th, 2029.

3. At any time while not in default under this Agreement, the Borrower may pay the outstanding balance to the Lender without further bonus or penalty.

**Extension**

4. Lender agrees that Borrower has the sole right and decision making authority to be granted an extension of this Agreement for up to ten (10) additional years upon the request of the Borrower.

**Use of Funds**

5. Lender shall have no obligation to see that funds advanced under this Agreement are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for and sole discretion of the proper application of funds advanced pursuant to this Agreement. Proper application is to be defined as using funds in accordance with a Business Plan provided by Borrower attached hereto as Exhibit A. Lender fully understands the Business Plan provided by the Borrower. Lender agrees to indemnify the Borrower and hold the Borrower harmless for any risks associated the proper application of funds contained in the Business Plan.

**Borrower Default**

6. Notwithstanding anything to the contrary in this Agreement, if the Borrower defaults in the performance of any obligation under this Agreement, the Borrower will have one hundred twenty (120) days to cure the default.

**Borrower Default Lender's Sole Remedy**

7. Upon a Borrower Default, the sole remedy for the Lender is that the Lender and Borrower must negotiate a reasonable mutually agreed upon payment plan to pay off any accrued interest and outstanding principal. If a payment plan cannot be agreed upon within sixty (60) days from the date of the Borrower default, this dispute will be governed by Section 31 in this agreement.

**Lender Default**

8. The Lender will be in default if any of the following occur: (1) any attempt at early termination or acceleration of payments, (2) any change in control of Lender, and (3) violating any of the terms set forth in this Agreement.

**Exclusion from Voting**

9. Upon becoming a defaulting Lender, such Lender will lose its ability to vote on amendments, waivers and consents. In the event of a Lender default, the Lender shall be excluded from all decisions that require mutual consent.

**Fees Upon Lender Default**

10. While a Lender remains a defaulting Lender, Lender will no longer be entitled to receive any commitment fees that would have otherwise been payable.

**Improper Acceleration**

11. The Lender may not under any circumstance accelerate any amounts due under the loan.

**Insecurity Clause**

12. The Lender may not accelerate any amounts due under the loan if it feels insecure from the actions by the Borrower.

**Wrongful Interference**

13. Lenders shall not improperly exert undue control or interfere with the Borrower's contracts with third parties. If Lender improperly exerts undue control or interferes with the Borrower's contracts, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Interference with Management**

14. Lenders shall not improperly exert undue control or interfere with the Borrower's management team. If Lender improperly exerts undue control or interferes with the Borrower's management team, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Enforcement Costs**

15. All costs, expenses and expenditures including, without limitation, the complete legal costs incurred by enforcing this Agreement will be paid by the Lender.

**Governing Law**

16. This Agreement will be construed in accordance with and governed by the laws of the State of Delaware.

**Amendments**

17. This Agreement may only be amended or modified by a mutually agreeable written instrument executed by both the Borrower and the Lender.

**Severability**

18. The clauses and paragraphs contained in this Agreement are intended to be read and construed independently of each other. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

**General Provisions**

19. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**Assignment**

20. The parties further agree that this Agreement may be assigned or sold at any time by the Borrower at its sole discretion. The Lender may not assign or sell this Agreement without prior written consent and approval by the Borrower.

**Release of Mortgage/Security Agreement**

21. Not applicable.

**Life Insurance**

22. Not applicable.

**No Required Collateral**

23. No collateral of any kind is required by or part of this Agreement.

**No Personal Guarantee**

24. There are no personal guarantees requirements of any kind with this Agreement.

**Non-Recourse**

25. This is a non-recourse loan. The Lender shall have no recourse against the Borrower.

**Unsecured Loan**

26. This is a unsecured loan.

**Confidentiality**

27. Lender hereby agrees to maintain confidential this Agreement, and any information disclosed by Borrower related to the terms upon which funding of the loan is to take place. Lender's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Lender to pecuniary damages and any other remedies available to Borrower in law or at equity, including but not limited to injunctive relief. All such remedies are cumulative in nature.

**Indemnification**

28. The Lender shall indemnify, defend, and hold harmless the Borrower and its respective officers and employees from any liabilities, claims, claw backs, suits, judgments, and damages arising as a result of the performance of the obligations under this Agreement. The liability of the Lender under

this Agreement shall continue after the termination of the Agreement with respect to any liabilities, claims, claw backs, suits, judgments and damages resulting from acts occurring prior to and after the termination of this Agreement. Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender as soon as any liabilities, claims, claw backs, suits, judgments, and damages arise and the following remedies will be immediately available to the Borrower: (1) Upon Borrower's first demand the Lender shall be required to pay all reasonable costs to remedy any liabilities, claims, claw backs, suits, judgments, and damages within ten (10) business days upon receipt the notice from the Lender to the Borrower. (2) In addition, Lender agrees to pay all reasonable costs to the Borrower's sole satisfaction.

**Amendments**

29. Changes to this Agreement will not be effective or binding unless in writing and signed by both parties to the Agreement.

**Termination of Agreement**

30. Borrower may terminate this agreement for any reason or no reason at all by giving the Lender at least ten (10) days' prior notice. If the Lender commits a breach of its obligations under this agreement, the Borrower may terminate this agreement by giving the breaching party at least ten (10) days' prior notice, except that any such notice will not result in termination if the breaching party cures that breach before the thirty (30) day cure period elapses. A breach of this Agreement includes, but is not limited to, the following: (1) Lender's failure to pay any amount, and (2) Lender's failure to timely deliver funds. If the Lender attempts to terminate this Agreement early, Lender agrees to pay attorney's fees and all costs on behalf of the Borrower. The Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Binding Arbitration**

31. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Delaware, before one (1) arbitrator in an expedited manner and without undue delay. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such

demand pursuant to the notice requirements set forth in Section 35 herein. Within sixty (60) days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, or this Agreement to arbitrate. All arbitration fees, including but not limited to administrative fees, arbitrator fees, and other expenses related to the arbitration proceeding, shall be paid by the Lender. In the event this section is ignored by either party, the affected party shall be immediately awarded any attorney's fees spent on compelling the arbitration.

**<u>Disclaimer of Liability</u>**

32. Borrower has no liability or obligation in connection with this Agreement and makes no warranties or representations in connection therewith. No claim may be made by the Lender or any other Person against the Borrower or the Affiliates, directors, officers, employees, attorneys or agents of the Borrower for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their

favor and regardless of whether Borrower has been advised of the likelihood of such loss of damage.

**Publicity**

33. Lender and Borrower shall have the right to issue periodic news releases and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld.

**Divisibility**

34. The invalidity of any one or more phrases, sentences, clauses, or section contained in this Agreement shall not affect the remaining portions of this Agreement, or any part thereof. Further, various headings included in this Agreement exist purely as an aid to locate particular wording, and do not in and of themselves in any way affect the substance of this Agreement.

**Notices**

35. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by certified mail:

To Borrower: ZOOMERAL Inc.

251 LITTLE FALLS DRIVE

Wilmington, Delaware 19808

To Lender: Genie Investments NV

P.O. Box 5886

Wilmington, Delaware 19808

**Entire Agreement**

36. This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

**IN WITNESS WHEREOF**, the parties have duly affixed their signatures under hand and seal on this **SIGNED, SEALED, AND DELIVERED** this 5th day of September, 2022.

David Hughes on behalf of ZOOMERAL, Inc.
Borrower

John Michael Cohan on behalf of Genie Investments
Lender

Exhibit A

ZOOMERAL

## Executive Summary

**Company Overview:** ZOOMERAL Inc. is a pioneering SaaS company focused on delivering innovative educational materials to the financial industry. Our mission is to enhance productivity and streamline operations through advanced technology, intuitive design, and scalable features.

**Vision Statement:** To become a leading provider of SaaS solutions, recognized for transforming how businesses can obtain a lower cost of capital through competition.

**Financial Highlights:** As ZOOMERAL is a startup corporation, it is impossible at this time to predict future financial performance.

## Business Model

**Value Proposition:** ZOOMERAL Inc. offers a subscription-based editable software product that benefits our subscribers in many ways.

**Revenue Streams:** Subscription fees, sale of digital data storage, and marketing services

## Marketing and Sales Strategy

**Marketing Plan:** Digital marketing, including SEO, content marketing, and social media, partnerships with industry influencers, and attendance at relevant conferences and trade shows.

**Sales Strategy:** Direct sales through an in-house team, leveraging CRM tools to track leads and conversions, and offering tiered pricing structures to cater to different customer needs.

## Risk Analysis

**Investment and Loan Risks:**

- **Total Loss Risk:** Investors and lenders should be aware that there is a non-trivial risk of total loss. The SaaS market is highly competitive, and despite our rigorous market analysis and product development efforts, external factors such as market saturation, technological advancements by competitors, or shifts in regulatory landscapes could adversely affect our business.
- **Discretion in Use of Funds:** ZOOMERAL Inc. retains the sole discretion to allocate any loan or investment proceeds/funds as ZOOMERAL sees fit. This flexibility is crucial for the company to respond swiftly to emerging opportunities or challenges. ZOOMERAL also makes high risk investments including but not limited to stocks, bonds, and stock options from time to time as ZOOMERAL sees fit in public companies listed on the United States Stock Exchange and the Chicago Board of Options Exchange.

- **Business Continuity Risks:** There exists a risk that ZOOMERAL might go out of business due to reasons including, but not limited to, insufficient market traction, inability to secure further funding, significant operational failures, losses due to investments or catastrophic events.
- **Failure Risk:** The potential for ZOOMERAL to completely fail is a possible reality, as with any startup venture. This could result from product development hurdles, failure to achieve market fit, or being outpaced by competitors.

## Conclusion

ZOOMERAL Inc. is poised to make significant inroads into the financial educational market with its innovative SaaS offerings. While we are confident in our business model, strategy, and the market's potential, we acknowledge the inherent risks involved in any entrepreneurial venture.

# Exhibit B

# LOAN AGREEMENT

**THIS LOAN AGREEMENT (this "Agreement") dated this 5th day of September, 2022**

**BETWEEN:**

Genie Investments NV
(the "Lender")

**AND**

Capitulum LLC
(the "Borrower")

**IN CONSIDERATION OF** the Lender loaning certain monies (the "Loan") to the Borrower, and the Borrower repaying the Loan to the Lender, both parties agree to keep, perform and fulfill the promises and conditions set out in this Agreement:

**Loan Amount & Interest**

1. The Lender promises to loan up to $1,500,000.00 (One Million Five Hundred Thousand Dollars and No Cents) in the form of a non-recourse unsecured line of credit to the Borrower and the Borrower promises to repay this principal amount to the Lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance. The loan amount can increase at any time if mutually agreed upon in writing by both Borrower and Lender. The Lender shall not have the ability to decrease the loan amount at any time.

**Payment**

2. This Loan will be repaid in the form of one (1) balloon payment due on December 5th, 2029.

3. At any time while not in default under this Agreement, the Borrower may pay the outstanding balance to the Lender without further bonus or penalty.

**Extension**

4. Lender agrees that Borrower has the sole right and decision making authority to be granted an extension of this Agreement for up to ten (10) additional years upon the request of the Borrower.

**Use of Funds**

5. Lender shall have no obligation to see that funds advanced under this Agreement are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for and sole discretion of the proper application of funds advanced pursuant to this Agreement. Proper application is to be defined as using funds in accordance with a Business Plan provided by Borrower attached hereto as Exhibit A. Lender fully understands the Business Plan provided by the Borrower. Lender agrees to indemnify the Borrower and hold the Borrower harmless for any risks associated the proper application of funds contained in the Business Plan.

**Borrower Default**

6. Notwithstanding anything to the contrary in this Agreement, if the Borrower defaults in the performance of any obligation under this Agreement, the Borrower will have one hundred twenty (120) days to cure the default.

**Borrower Default Lender's Sole Remedy**

7. Upon a Borrower Default, the sole remedy for the Lender is that the Lender and Borrower must negotiate a reasonable mutually agreed upon payment plan to pay off any accrued interest and outstanding principal. If a payment plan cannot be agreed upon within sixty (60) days from the date of the Borrower default, this dispute will be governed by Section 31 in this agreement.

**Lender Default**

8. The Lender will be in default if any of the following occur: (1) any attempt at early termination or acceleration of payments, (2) any change in control of Lender, and (3) violating any of the terms set forth in this Agreement.

**Exclusion from Voting**

9. Upon becoming a defaulting Lender, such Lender will lose its ability to vote on amendments, waivers and consents. In the event of a Lender default, the Lender shall be excluded from all decisions that require mutual consent.

**Fees Upon Lender Default**

10. While a Lender remains a defaulting Lender, Lender will no longer be entitled to receive any commitment fees that would have otherwise been payable.

**Improper Acceleration**

11. The Lender may not under any circumstance accelerate any amounts due under the loan.

**Insecurity Clause**

12. The Lender may not accelerate any amounts due under the loan if it feels insecure from the actions by the Borrower.

**Wrongful Interference**

13. Lenders shall not improperly exert undue control or interfere with the Borrower’s contracts with third parties. If Lender improperly exerts undue control or interferes with the Borrower's contracts, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Interference with Management**

14. Lenders shall not improperly exert undue control or interfere with the Borrower’s management team. If Lender improperly exerts undue control or interferes with the Borrower's management team, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Enforcement Costs**

15. All costs, expenses and expenditures including, without limitation, the complete legal costs incurred by enforcing this Agreement will be paid by the Lender.

**Governing Law**

16. This Agreement will be construed in accordance with and governed by the laws of the State of Delaware.

**Amendments**

17. This Agreement may only be amended or modified by a mutually agreeable written instrument executed by both the Borrower and the Lender.

**Severability**

18. The clauses and paragraphs contained in this Agreement are intended to be read and construed independently of each other. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

**General Provisions**

19. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**Assignment**

20. The parties further agree that this Agreement may be assigned or sold at any time by the Borrower at its sole discretion. The Lender may not assign or sell this Agreement without prior written consent and approval by the Borrower.

**Release of Mortgage/Security Agreement**

21. Not applicable.

**Life Insurance**

22. Not applicable.

**No Required Collateral**

23. No collateral of any kind is required by or part of this Agreement.

**No Personal Guarantee**

24. There are no personal guarantees requirements of any kind with this Agreement.

**Non-Recourse**

25. This is a non-recourse loan. The Lender shall have no recourse against the Borrower.

**Unsecured Loan**

26. This is a unsecured loan.

**Confidentiality**

27. Lender hereby agrees to maintain confidential this Agreement, and any information disclosed by Borrower related to the terms upon which funding of the loan is to take place. Lender's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Lender to pecuniary damages and any other remedies available to Borrower in law or at equity, including but not limited to injunctive relief. All such remedies are cumulative in nature.

**Indemnification**

28. The Lender shall indemnify, defend, and hold harmless the Borrower and its respective officers and employees from any liabilities, claims, claw backs, suits, judgments, and damages arising as a result of the performance of the obligations under this Agreement. The liability of the Lender under

this Agreement shall continue after the termination of the Agreement with respect to any liabilities, claims, claw backs, suits, judgments and damages resulting from acts occurring prior to and after the termination of this Agreement. Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender as soon as any liabilities, claims, claw backs, suits, judgments, and damages arise and the following remedies will be immediately available to the Borrower: (1) Upon Borrower's first demand the Lender shall be required to pay all reasonable costs to remedy any liabilities, claims, claw backs, suits, judgments, and damages within ten (10) business days upon receipt the notice from the Lender to the Borrower. (2) In addition, Lender agrees to pay all reasonable costs to the Borrower's sole satisfaction.

**Amendments**

29. Changes to this Agreement will not be effective or binding unless in writing and signed by both parties to the Agreement.

**Termination of Agreement**

30. Borrower may terminate this agreement for any reason or no reason at all by giving the Lender at least ten (10) days' prior notice. If the Lender commits a breach of its obligations under this agreement, the Borrower may terminate this agreement by giving the breaching party at least ten (10) days' prior notice, except that any such notice will not result in termination if the breaching party cures that breach before the thirty (30) day cure period elapses. A breach of this Agreement includes, but is not limited to, the following: (1) Lender's failure to pay any amount, and (2) Lender's failure to timely deliver funds. If the Lender attempts to terminate this Agreement early, Lender agrees to pay attorney's fees and all costs on behalf of the Borrower. The Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Binding Arbitration**

31. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Delaware, before one (1) arbitrator in an expedited manner and without undue delay. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such

demand pursuant to the notice requirements set forth in Section 35 herein. Within sixty (60) days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, or this Agreement to arbitrate. All arbitration fees, including but not limited to administrative fees, arbitrator fees, and other expenses related to the arbitration proceeding, shall be paid by the Lender. In the event this section is ignored by either party, the affected party shall be immediately awarded any attorney's fees spent on compelling the arbitration.

**Disclaimer of Liability**

32. Borrower has no liability or obligation in connection with this Agreement and makes no warranties or representations in connection therewith. No claim may be made by the Lender or any other Person against the Borrower or the Affiliates, directors, officers, employees, attorneys or agents of the Borrower for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their

favor and regardless of whether Borrower has been advised of the likelihood of such loss of damage.

**Publicity**

33. Lender and Borrower shall have the right to issue periodic news releases and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld.

**Divisibility**

34. The invalidity of any one or more phrases, sentences, clauses, or section contained in this Agreement shall not affect the remaining portions of this Agreement, or any part thereof. Further, various headings included in this Agreement exist purely as an aid to locate particular wording, and do not in and of themselves in any way affect the substance of this Agreement.

**Notices**

35. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by certified mail:

To Borrower: Capitulum LLC

P.O. Box 7973

Newark, Delaware 19711

To Lender: Genie Investments NV

P.O. Box 5886

Wilmington, Delaware 19808

**Entire Agreement**

36. This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

**IN WITNESS WHEREOF**, the parties have duly affixed their signatures under hand and seal on this **SIGNED, SEALED, AND DELIVERED** this 5th day of September, 2022.

John Michael Cohan on behalf of Capitulum LLC
Borrower

David Hughes on behalf of Genie Investments
Lender

Exhibit A

## Executive Summary

- **Company Name:** Capitulum LLC
- **Business Model:** Real estate investments, including purchasing, renovating, and selling properties with a focus on residential real estate.
- **Mission Statement:** To transform undervalued properties into desirable homes, creating value for communities and returns for our investors.
- **Vision:** To be recognized as a leader in responsible and profitable real estate investment, contributing to the revitalization of neighborhoods.

## Business Description

- **Services Offered:** Acquisition and sale of real estate properties, property management, real estate market analysis, and investment opportunities.
- **Target Market:** Investors looking for opportunities in the real estate market, homeowners, and renters.
- **Legal Structure:** Limited Liability Company (LLC), protecting owners' personal assets from company liabilities.

## Market Analysis

- **Industry Overview:** Analysis of the real estate market trends, including demand for housing, investment return rates, and economic factors influencing the market.
- **Competitive Analysis:** Overview of competitors, their strategies, strengths, and weaknesses, and Capitulum LLC's competitive advantages.

## Strategy and Implementation

- **Marketing Strategy:** Digital marketing, networking with real estate professionals, and hosting investment seminars.
- **Sales Strategy:** Direct sales to property buyers, investment partnerships, and leveraging real estate agents.
- **Growth Plan:** Expansion into new markets, diversification of property portfolio, and scaling up investment opportunities.

## Management Team

- **Founders' Backgrounds:** Details on the experience, skills, and qualifications of the founding members.
- **Roles and Responsibilities:** Outline of the management structure, including roles, responsibilities, and decision-making processes.

## Financial Plan

- **Start-Up Costs:** Initial capital required, sources of funds, and allocation.
- **Revenue Projections:** Expected income from property sales and investments.
- **Expense Forecast:** Operating expenses, property acquisition costs, and renovation expenses.

## Risk Factors and Disclaimers

- **Investment Risks:** Outline of the risks associated with any loan or investment, including the possibility of total loss.
- **Discretionary Spending:** Statement that Capitulum LLC reserves the right to spend any loan or investment at its sole discretion.
- **Business Continuity:** Acknowledgment that Capitulum LLC might go out of business or might completely fail due to various factors, including market downturns, operational failures, or catastrophic events.

# Exhibit C

# LOAN AGREEMENT

**THIS LOAN AGREEMENT (this "Agreement") dated this 5th day of September 2022**

**BETWEEN:**

Genie Investments NV, Inc.
(the "Lender")

**AND**

CALD Holdings LLC
(the "Borrower")

**IN CONSIDERATION OF** the Lender loaning certain monies (the "Loan") to the Borrower, and the Borrower repaying the Loan to the Lender, both parties agree to keep, perform and fulfill the promises and conditions set out in this Agreement:

**Loan Amount & Interest**

1. The Lender promises to loan up to $1,500,000 One Million Five Hundred Thousand Dollars and No Cents in the form of a non-recourse unsecured line of credit to the Borrower and the Borrower promises to repay this principal amount to the Lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance. The loan amount can increase at any time if mutually agreed upon in writing by both Borrower and Lender. The Lender shall not have the ability to decrease the loan amount at any time.

**Payment**

2. This Loan will be repaid in the form of one (1) balloon payment due on December 5th, 2029.

3. At any time while not in default under this Agreement, the Borrower may pay the outstanding balance to the Lender without further bonus or penalty.

**Extension**

4. Lender agrees that Borrower has the sole right and decision making authority to be granted an extension of this Agreement for up to ten (10) additional years upon the request of the Borrower.

**Use of Funds**

5. Lender shall have no obligation to see that funds advanced under this Agreement are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for and sole discretion of the proper application of funds advanced pursuant to this Agreement. Proper application is to be defined as using funds in accordance with a Business Plan provided by Borrower attached hereto as Exhibit A. Lender fully understands the Business Plan provided by the Borrower. Lender agrees to indemnify the Borrower and hold the Borrower harmless for any risks associated the proper application of funds contained in the Business Plan.

**Borrower Default**

6. Notwithstanding anything to the contrary in this Agreement, if the Borrower defaults in the performance of any obligation under this Agreement, the Borrower will have one hundred twenty (120) days to cure the default.

**Borrower Default Lender's Sole Remedy**

7. Upon a Borrower Default, the sole remedy for the Lender is that the Lender and Borrower must negotiate a reasonable mutually agreed upon payment plan to pay off any accrued interest and outstanding principal. If a payment plan cannot be agreed upon within sixty (60) days from the date of the Borrower default, this dispute will be governed by Section 31 in this agreement.

**Lender Default**

8. The Lender will be in default if any of the following occur: (1) any attempt at early termination or acceleration of payments, (2) any change in control of Lender, and (3) violating any of the terms set forth in this Agreement.

**Exclusion from Voting**

9. Upon becoming a defaulting Lender, such Lender will lose its ability to vote on amendments, waivers and consents. In the event of a Lender default, the Lender shall be excluded from all decisions that require mutual consent.

**Fees Upon Lender Default**

10. While a Lender remains a defaulting Lender, Lender will no longer be entitled to receive any commitment fees that would have otherwise been payable.

**Improper Acceleration**

11. The Lender may not under any circumstance accelerate any amounts due under the loan.

**Insecurity Clause**

12. The Lender may not accelerate any amounts due under the loan if it feels insecure from the actions by the Borrower.

**Wrongful Interference**

13. Lenders shall not improperly exert undue control or interfere with the Borrower's contracts with third parties. If Lender improperly exerts undue control or interferes with the Borrower's contracts, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Interference with Management**

14. Lenders shall not improperly exert undue control or interfere with the Borrower's management team. If Lender improperly exerts undue control or interferes with the Borrower's management team, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Enforcement Costs**

15. All costs, expenses and expenditures including, without limitation, the complete legal costs incurred by enforcing this Agreement will be paid by the Lender.

**Governing Law**

16. This Agreement will be construed in accordance with and governed by the laws of the State of Delaware.

**Amendments**

17. This Agreement may only be amended or modified by a mutually agreeable written instrument executed by both the Borrower and the Lender.

**Severability**

18. The clauses and paragraphs contained in this Agreement are intended to be read and construed independently of each other. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

**General Provisions**

19. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**Assignment**

20. The parties further agree that this Agreement may be assigned or sold at any time by the Borrower at its sole discretion. The Lender may not assign or sell this Agreement without prior written consent and approval by the Borrower.

**Release of Mortgage/Security Agreement**

21. Not applicable.

**Life Insurance**

22. Not applicable.

**No Required Collateral**

23. No collateral of any kind is required by or part of this Agreement.

**No Personal Guarantee**

24. There are no personal guarantees requirements of any kind with this Agreement.

**Non-Recourse**

25. This is a non-recourse loan. The Lender shall have no recourse against the Borrower.

**Unsecured Loan**

26. This is a unsecured loan.

**Confidentiality**

27. Lender hereby agrees to maintain confidential this Agreement, and any information disclosed by Borrower related to the terms upon which funding of the loan is to take place. Lender's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Lender to pecuniary damages and any other remedies available to Borrower in law or at equity, including but not limited to injunctive relief. All such remedies are cumulative in nature.

**Indemnification**

28. The Lender shall indemnify, defend, and hold harmless the Borrower and its respective officers and employees from any liabilities, claims, claw backs, suits, judgments, and damages arising as a result of the performance of the obligations under this Agreement. The liability of the Lender under

this Agreement shall continue after the termination of the Agreement with respect to any liabilities, claims, claw backs, suits, judgments and damages resulting from acts occurring prior to and after the termination of this Agreement. Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender as soon as any liabilities, claims, claw backs, suits, judgments, and damages arise and the following remedies will be immediately available to the Borrower: (1) Upon Borrower's first demand the Lender shall be required to pay all reasonable costs to remedy any liabilities, claims, claw backs, suits, judgments, and damages within ten (10) business days upon receipt the notice from the Lender to the Borrower. (2) In addition, Lender agrees to pay all reasonable costs to the Borrower's sole satisfaction.

**Amendments**

29. Changes to this Agreement will not be effective or binding unless in writing and signed by both parties to the Agreement.

**Termination of Agreement**

30. Borrower may terminate this agreement for any reason or no reason at all by giving the Lender at least ten (10) days' prior notice. If the Lender commits a breach of its obligations under this agreement, the Borrower may terminate this agreement by giving the breaching party at least ten (10) days' prior notice, except that any such notice will not result in termination if the breaching party cures that breach before the thirty (30) day cure period elapses. A breach of this Agreement includes, but is not limited to, the following: (1) Lender's failure to pay any amount, and (2) Lender's failure to timely deliver funds. If the Lender attempts to terminate this Agreement early, Lender agrees to pay attorney's fees and all costs on behalf of the Borrower. The Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Binding Arbitration**

31. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Delaware, before one (1) arbitrator in an expedited manner and without undue delay. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such

demand pursuant to the notice requirements set forth in Section 35 herein. Within sixty (60) days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, or this Agreement to arbitrate. All arbitration fees, including but not limited to administrative fees, arbitrator fees, and other expenses related to the arbitration proceeding, shall be paid by the Lender. In the event this section is ignored by either party, the affected party shall be immediately awarded any attorney's fees spent on compelling the arbitration.

**Disclaimer of Liability**

32. Borrower has no liability or obligation in connection with this Agreement and makes no warranties or representations in connection therewith. No claim may be made by the Lender or any other Person against the Borrower or the Affiliates, directors, officers, employees, attorneys or agents of the Borrower for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their

favor and regardless of whether Borrower has been advised of the likelihood of such loss of damage.

**Publicity**

33. Lender and Borrower shall have the right to issue periodic news releases and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld.

**Divisibility**

34. The invalidity of any one or more phrases, sentences, clauses, or section contained in this Agreement shall not affect the remaining portions of this Agreement, or any part thereof. Further, various headings included in this Agreement exist purely as an aid to locate particular wording, and do not in and of themselves in any way affect the substance of this Agreement.

**Notices**

35. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by certified mail:

To Borrower: CALD Holdings LLC

11064 Lothmore Road

Jacksonville, Florida 32221

To Lender: Genie Investments NV

P.O. Box 5886

Wilmington, Delaware 19808

**Entire Agreement**

36. This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

**IN WITNESS WHEREOF**, the parties have duly affixed their signatures under hand and seal on this **SIGNED, SEALED, AND DELIVERED** this 5th day of September, 2022.

Caleb Davis on behalf of CALD Holdings LLC
Borrower

John Michael Cohan on behalf of Genie Investments NV Inc.
Lender

# CALD HOLDINGS LLC

Business Plan: Integrated Investment and Philanthropy
1.Executive Summary: CALD HOLDINGS is a privately owned investment firm specializing in stocks and bonds, leveraging our own capital to generate financial returns. In addition to our investment activities, we are committed to giving back to our community through philanthropic initiatives, including supporting local churches and investing in youth athletics programs.

2. Mission Statement: CALD HOLDINGS strives to achieve superior returns through prudent investment strategies while making a positive impact in our community by supporting local churches and fostering youth development through athletics.

3. Business Description: We are an independent investment firm with a focus on managing our own capital through strategic investments in stocks and bonds. Our investment philosophy is rooted in fundamental analysis, risk management, and a long-term perspective. Beyond financial gains, we prioritize giving back to our community through philanthropic endeavors.

4. Investment Strategy:Capital Allocation: We allocate our capital across a diversified portfolio of stocks and bonds, with a focus on value investing and income generation.
Research and Analysis: Our team conducts rigorous research and analysis to identify undervalued securities and investment opportunities with strong fundamentals and growth potential.
Risk Management: We employ disciplined risk management techniques to preserve capital and mitigate downside risk, including portfolio diversification and active monitoring.
Long-Term Focus: We maintain a long-term investment horizon, allowing our investments to compound over time and deliver sustainable returns.
5. Philanthropy Initiatives:Support for Local Churches: We contribute a portion of our profits to support local churches and their outreach programs, including charitable initiatives, community events, and social services.
Investment in Youth Athletics: We invest in youth athletics programs to promote physical fitness, teamwork, leadership skills, and personal development among young athletes, fostering a culture of health and wellness in our community.
Volunteerism and Engagement: Our team actively participates in volunteer activities, fundraising efforts, and community engagement initiatives to support our philanthropic objectives and make a meaningful impact.
6. Financial Projections:Revenue Generation: Our revenue streams primarily consist of investment income generated from our stock and bond portfolio, supplemented by any capital gains realized from successful investments.Profitability: We aim to achieve sustainable profitability by generating competitive returns on our investments while maintaining cost efficiency and operational excellence.Philanthropic Contributions: We allocate a portion of our profits to support philanthropic initiatives, ensuring a positive social impact alongside financial success.

7. Growth Strategy:Investment Opportunities: We continuously seek out new investment opportunities and asset classes that offer attractive risk-adjusted returns, adapting our investment strategy to capitalize on emerging trends and market opportunities.
Community Engagement: We actively engage with our local community to identify areas of need and opportunities for philanthropic investment, fostering partnerships with local churches, youth athletics organizations, and other community stakeholders.
Brand Awareness: We seek to enhance our brand visibility and reputation through effective marketing, networking, and thought leadership in the investment and philanthropy space.
8. Risk Management:Market Risk: We actively monitor market trends and economic indicators to anticipate and mitigate potential market risks, adjusting our investment strategy as needed to preserve capital and maximize returns.
Operational Risk: We implement robust internal controls and procedures to manage operational risks associated with our investment activities, ensuring compliance with regulatory requirements and industry best practices.
Reputation Risk: We prioritize transparency, integrity, and accountability in all aspects of our business, safeguarding our reputation and earning the trust of'our clients, partners, and community stakeholders.
9. Team: Our team consists of seasoned professionals with extensive experience in finance, investment management, and philanthropy. Together, we are dedicated to achieving our mission of delivering superior investment performance while making a positive impact in our community.
10. Conclusion: At CALD HOLDINGS, we believe in the power of investing to create wealth and prosperity, not only for ourselves but also for the greater good of our community. By integrating our investment and philanthropy efforts, we aim to build a brighter future for generations to come, one investment and one contribution at a time.We invite you to join us on this journey of financial success and social responsibility, where every investment we make contributes to a better world for all.

# Exhibit D

# LOAN AGREEMENT

**THIS LOAN AGREEMENT (this "Agreement") dated this 15th day of August, 2023**

**BETWEEN:**

Genie Investments NV
(the "Lender")

**AND**

Genie Investments II LLC
(the "Borrower")

**IN CONSIDERATION OF** the Lender loaning certain monies (the "Loan") to the Borrower, and the Borrower repaying the Loan to the Lender, both parties agree to keep, perform and fulfill the promises and conditions set out in this Agreement:

**Loan Amount & Interest**

1. The Lender promises to loan up to $2,000,000.00 (Two Million Dollars and No Cents) in the form of a non-recourse unsecured line of credit to the Borrower and the Borrower promises to repay this principal amount to the Lender, with any accrued interest payable on the unpaid principal at the rate of 0. 1 percent (.1%) per annum, calculated yearly not in advance. The loan amount can increase at any time if mutually agreed upon in writing by both Borrower and Lender. The Lender shall not have the ability to decrease the loan amount at any time.

**Payment**

2. This Loan will be repaid in the form of one (1) balloon payment due on August 15th, 2030.

3. At any time while not in default under this Agreement, the Borrower may pay the outstanding balance to the Lender without further bonus or penalty.

**<u>Extension</u>**

4. Lender agrees that Borrower has the sole right and decision making authority to be granted an extension of this Agreement for up to ten (10) additional years upon the request of the Borrower.

**<u>Use of Funds</u>**

5. Lender shall have no obligation to see that funds advanced under this Agreement are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for and sole discretion of the proper application of funds advanced pursuant to this Agreement. Proper application is to be defined as using funds in accordance with a Business Plan provided by Borrower attached hereto as Exhibit A. Lender fully understands the Business Plan provided by the Borrower. Lender agrees to indemnify the Borrower and hold the Borrower harmless for any risks associated the proper application of funds contained in the Business Plan.

**<u>Borrower Default</u>**

Notwithstanding anything to the contrary in this Agreement, if the Borrower defaults in the performance of any obligation under this Agreement, the Borrower will have one hundred twenty (120) days to cure the default.

**<u>Borrower Default Lender's Sole Remedy</u>**

6. Upon a Borrower Default, the sole remedy for the Lender is that the Lender and Borrower must negotiate a reasonable mutually agreed upon payment plan to pay off any accrued interest and outstanding principal. If a payment plan cannot be agreed upon within sixty (60) days from the date of the Borrower default, this dispute will be governed by Section 31 in this agreement.

**<u>Lender Default</u>**

7. The Lender will be in default if any of the following occur: (1) any attempt at early termination or acceleration of payments, (2) any change in control of Lender, and (3) violating any of the terms set forth in this Agreement.

**Exclusion from Voting**

8. Upon becoming a defaulting Lender, such Lender will lose its ability to vote on amendments, waivers and consents. In the event of a Lender default, the Lender shall be excluded from all decisions that require mutual consent.

**Fees Upon Lender Default**

9. While a Lender remains a defaulting Lender, Lender will no longer be entitled to receive any commitment fees that would have otherwise been payable.

**Improper Acceleration**

10. The Lender may not under any circumstance accelerate any amounts due under the loan.

**Insecurity Clause**

11. The Lender may not accelerate any amounts due under the loan if it feels insecure from the actions by the Borrower.

**Wrongful Interference**

12. Lenders shall not improperly exert undue control or interfere with the Borrower's contracts with third parties. If Lender improperly exerts undue control or interferes with the Borrower's contracts, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Interference with Management**

13. Lenders shall not improperly exert undue control or interfere with the Borrower's management team. If Lender improperly exerts undue control or interferes with the Borrower's management team, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Enforcement Costs**

14. All costs, expenses and expenditures including, without limitation, the complete legal costs incurred by enforcing this Agreement will be paid by the Lender.

**Governing Law**

15. This Agreement will be construed in accordance with and governed by the laws of the State of Delaware.

**Amendments**

16. This Agreement may only be amended or modified by a mutually agreeable written instrument executed by both the Borrower and the Lender.

**Severability**

17. The clauses and paragraphs contained in this Agreement are intended to be read and construed independently of each other. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

**General Provisions**

18. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**Assignment**

19. The parties further agree that this Agreement may be assigned or sold at any time by the Borrower at its sole discretion. The Lender may not assign or sell this Agreement without prior written consent and approval by the Borrower.

**Release of Mortgage/Security Agreement**

20. Not applicable.

**Life Insurance**

21. Not applicable.

**No Required Collateral**

22. No collateral of any kind is required by or part of this Agreement.

**No Personal Guarantee**

23. There are no personal guarantees requirements of any kind with this Agreement.

**Non-Recourse**

24. This is a non-recourse loan. The Lender shall have no recourse against the Borrower.

**Unsecured Loan**

25. This is a unsecured loan.

**Confidentiality**

26. Lender hereby agrees to maintain confidential this Agreement, and any information disclosed by Borrower related to the terms upon which funding of the loan is to take place. Lender's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Lender to pecuniary damages and any other remedies available to Borrower in law or at equity, including but not limited to injunctive relief. All such remedies are cumulative in nature.

**Indemnification**

27. The Lender shall indemnify, defend, and hold harmless the Borrower and its respective officers and employees from any liabilities, claims, claw backs, suits, judgments, and damages arising as a result of the performance of the obligations under this Agreement. The liability of the Lender under

this Agreement shall continue after the termination of the Agreement with respect to any liabilities, claims, claw backs, suits, judgments and damages resulting from acts occurring prior to and after the termination of this Agreement. Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender as soon as any liabilities, claims, claw backs, suits, judgments, and damages arise and the following remedies will be immediately available to the Borrower: (1) Upon Borrower's first demand the Lender shall be required to pay all reasonable costs to remedy any liabilities, claims, claw backs, suits, judgments, and damages within ten (10) business days upon receipt the notice from the Lender to the Borrower. (2) In addition, Lender agrees to pay all reasonable costs to the Borrower's sole satisfaction.

**Amendments**

28. Changes to this Agreement will not be effective or binding unless in writing and signed by both parties to the Agreement.

**Termination of Agreement**

29. Borrower may terminate this agreement for any reason or no reason at all by giving the Lender at least ten (10) days' prior notice. If the Lender commits a breach of its obligations under this agreement, the Borrower may terminate this agreement by giving the breaching party at least ten (10) days' prior notice, except that any such notice will not result in termination if the breaching party cures that breach before the thirty (30) day cure period elapses. A breach of this Agreement includes, but is not limited to, the following: (1) Lender's failure to pay any amount, and (2) Lender's failure to timely deliver funds. If the Lender attempts to terminate this Agreement early, Lender agrees to pay attorney's fees and all costs on behalf of the Borrower. The Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Binding Arbitration**

30. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Delaware, before one (1) arbitrator in an expedited manner and without undue delay. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such

demand pursuant to the notice requirements set forth in Section 35 herein. Within sixty (60) days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, or this Agreement to arbitrate. All arbitration fees, including but not limited to administrative fees, arbitrator fees, and other expenses related to the arbitration proceeding, shall be paid by the Lender. In the event this section is ignored by either party, the affected party shall be immediately awarded any attorney's fees spent on compelling the arbitration.

**Disclaimer of Liability**

31. Borrower has no liability or obligation in connection with this Agreement and makes no warranties or representations in connection therewith. No claim may be made by the Lender or any other Person against the Borrower or the Affiliates, directors, officers, employees, attorneys or agents of the Borrower for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their

favor and regardless of whether Borrower has been advised of the likelihood of such loss of damage.

**Publicity**

32. Lender and Borrower shall have the right to issue periodic news releases and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld.

**Divisibility**

33. The invalidity of any one or more phrases, sentences, clauses, or section contained in this Agreement shall not affect the remaining portions of this Agreement, or any part thereof. Further, various headings included in this Agreement exist purely as an aid to locate particular wording, and do not in and of themselves in any way affect the substance of this Agreement.

**Notices**

34. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by certified mail:

To Borrower: Genie Investments II LLC

P.O. Box 60443

Jacksonville, Florida 32236

To Lender: Genie Investments NV

P.O. Box 60443

Jacksonville, Florida 32236

**Entire Agreement**

35. This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

**IN WITNESS WHEREOF**, the parties have duly affixed their signatures under hand and seal on this **SIGNED, SEALED, AND DELIVERED** this 15th day of August, 2023.

John Michael Cohan on behalf of Genie Investments II LLC
Borrower

David Hughes on behalf of Genie Investments
Lender

Exhibit A

GI | GENIE INVESTMENTS

**Executive Summary**

**Business Name:** Genie Investments II LLC

**Business Model:** Genie Investments II LLC operates as a lending company, specializing in providing a range of investment and loan products to corporate clients. Our operations include assessing loan applications, managing investment portfolios, and offering lending products tailored to our clients' needs.

**Mission Statement:** To empower financial growth and stability for our clients through innovative lending solutions and investment opportunities, while maintaining transparency about the risks and rewards associated with financial activities.

**Vision:** To become a leading lending and investment firm known for its integrity, innovation, and ability to navigate the complexities of financial markets for the benefit of our stakeholders.

## Products and Services

- **Personal and Business Loans:** Customized lending solutions tailored to meet the needs of business clients.
- **Investment Management:** Diverse investment opportunities managed by experienced professionals, aiming to achieve optimal returns.

## Market Analysis

- **Target Market:** Small to medium-sized enterprises (SMEs) seeking flexible lending options and investment opportunities.
- **Industry Trends:** An analysis of current financial market trends, including interest rates, investment patterns, and regulatory changes.
- **Competitive Analysis:** Overview of key competitors, their market share, and strategies.

## Marketing and Sales Strategy

- **Sales Strategy:** Personalized service and relationship building, leveraging referrals and network marketing.

## Operations Plan

- **Process Flow:** Detailed description of loan application processing, investment decision-making, and client onboarding.
- **Technology Utilization:** Use of ZOOMERAL's fintech innovations for risk assessment, portfolio management, and customer service enhancement.
- **Compliance and Regulation:** Adherence to legal requirements and industry standards in all operations.

## Risk Management and Mitigation

- **Loan and Investment Risks:** Clear acknowledgment that investments and loans carry the risk of total loss. Strategies for risk assessment, including credit scoring and market analysis, will be employed to mitigate these risks.
- **Operational Risks:** Plans to manage risks related to operational failures, including technology backup systems, staff training, and compliance checks.
- **Business Continuity:** Strategies to ensure business operations can continue in adverse conditions, including financial reserves and insurance.
- **Discretionary Spending:** Statement that Genie Investments II LLC retains the right to allocate funds at its discretion, emphasizing the importance of trust between the company and its clients. Genie Investments II LLC also makes high risk investments including but not limited to stocks, bonds, and stock options from time to time as Genie Investments II LLC sees fit in public companies listed on the United States Stock Exchange and the Chicago Board of Options Exchange.

## Financial Plan

- **Revenue Streams:** Detailed projections of income from loans, investments, and consulting services.
- **Cost Structure:** Analysis of operational costs, including staffing, marketing, technology, and compliance.
- **Profitability Forecast:** Projections of financial performance, taking into account the risks and potential losses inherent in lending and investment.

## Conclusion

While Genie Investments II LLC is committed to generating substantial returns for our clients and stakeholders, we recognize the inherent risks of lending and investment activities. Our business plan is designed to navigate these risks through prudent management, innovative strategies, and a transparent relationship with our clients. We believe that by acknowledging potential challenges upfront, we can build a foundation of trust and resilience that will guide us through the complexities of the financial markets.

# Exhibit E

# LOAN AGREEMENT

**THIS LOAN AGREEMENT (this "Agreement") dated this 3rd day of January, 2023**

**BETWEEN:**

Genie Investments NV
(the "Lender")

**AND**

Better Methods LLC
(the "Borrower")

**IN CONSIDERATION OF** the Lender loaning certain monies (the "Loan") to the Borrower, and the Borrower repaying the Loan to the Lender, both parties agree to keep, perform and fulfill the promises and conditions set out in this Agreement:

**Loan Amount & Interest**

1. The Lender promises to loan up to $500,000.00 (Five Hundred Dollars and No Cents) in the form of a non-recourse unsecured line of credit to the Borrower and the Borrower promises to repay this principal amount to the Lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance. The loan amount can increase at any time if mutually agreed upon in writing by both Borrower and Lender. The Lender shall not have the ability to decrease the loan amount at any time.

**Payment**

2. This Loan will be repaid in the form of one (1) balloon payment due on January 3rd, 2030.

3. At any time while not in default under this Agreement, the Borrower may pay the outstanding balance to the Lender without further bonus or penalty.

**Extension**

4. Lender agrees that Borrower has the sole right and decision making authority to be granted an extension of this Agreement for up to ten (10) additional years upon the request of the Borrower.

**Use of Funds**

5. Lender shall have no obligation to see that funds advanced under this Agreement are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for and sole discretion of the proper application of funds advanced pursuant to this Agreement. Proper application is to be defined as using funds in accordance with a Business Plan provided by Borrower attached hereto as Exhibit A. Lender fully understands the Business Plan provided by the Borrower. Lender agrees to indemnify the Borrower and hold the Borrower harmless for any risks associated the proper application of funds contained in the Business Plan.

**Borrower Default**

6. Notwithstanding anything to the contrary in this Agreement, if the Borrower defaults in the performance of any obligation under this Agreement, the Borrower will have one hundred twenty (120) days to cure the default.

**Borrower Default Lender's Sole Remedy**

7. Upon a Borrower Default, the sole remedy for the Lender is that the Lender and Borrower must negotiate a reasonable mutually agreed upon payment plan to pay off any accrued interest and outstanding principal. If a payment plan cannot be agreed upon within sixty (60) days from the date of the Borrower default, this dispute will be governed by Section 31 in this agreement.

**Lender Default**

8. The Lender will be in default if any of the following occur: (1) any attempt at early termination or acceleration of payments, (2) any change in control of Lender, and (3) violating any of the terms set forth in this Agreement.

**Exclusion from Voting**

9. Upon becoming a defaulting Lender, such Lender will lose its ability to vote on amendments, waivers and consents. In the event of a Lender default, the Lender shall be excluded from all decisions that require mutual consent.

**Fees Upon Lender Default**

10. While a Lender remains a defaulting Lender, Lender will no longer be entitled to receive any commitment fees that would have otherwise been payable.

**Improper Acceleration**

11. The Lender may not under any circumstance accelerate any amounts due under the loan.

**Insecurity Clause**

12. The Lender may not accelerate any amounts due under the loan if it feels insecure from the actions by the Borrower.

**Wrongful Interference**

13. Lenders shall not improperly exert undue control or interfere with the Borrower's contracts with third parties. If Lender improperly exerts undue control or interferes with the Borrower's contracts, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Interference with Management**

14. Lenders shall not improperly exert undue control or interfere with the Borrower's management team. If Lender improperly exerts undue control or interferes with the Borrower's management team, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Enforcement Costs**

15. All costs, expenses and expenditures including, without limitation, the complete legal costs incurred by enforcing this Agreement will be paid by the Lender.

**Governing Law**

16. This Agreement will be construed in accordance with and governed by the laws of the State of Delaware.

**Amendments**

17. This Agreement may only be amended or modified by a mutually agreeable written instrument executed by both the Borrower and the Lender.

**Severability**

18. The clauses and paragraphs contained in this Agreement are intended to be read and construed independently of each other. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

**General Provisions**

19. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**Assignment**

20. The parties further agree that this Agreement may be assigned or sold at any time by the Borrower at its sole discretion. The Lender may not assign or sell this Agreement without prior written consent and approval by the Borrower.

**Release of Mortgage/Security Agreement**

21. Not applicable.

**Life Insurance**

22. Not applicable.

**No Required Collateral**

23. No collateral of any kind is required by or part of this Agreement.

**No Personal Guarantee**

24. There are no personal guarantees requirements of any kind with this Agreement.

**Non-Recourse**

25. This is a non-recourse loan. The Lender shall have no recourse against the Borrower.

**Unsecured Loan**

26. This is a unsecured loan.

**Confidentiality**

27. Lender hereby agrees to maintain confidential this Agreement, and any information disclosed by Borrower related to the terms upon which funding of the loan is to take place. Lender's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Lender to pecuniary damages and any other remedies available to Borrower in law or at equity, including but not limited to injunctive relief. All such remedies are cumulative in nature.

**Indemnification**

28. The Lender shall indemnify, defend, and hold harmless the Borrower and its respective officers and employees from any liabilities, claims, claw backs, suits, judgments, and damages arising as a result of the performance of the obligations under this Agreement. The liability of the Lender under

this Agreement shall continue after the termination of the Agreement with respect to any liabilities, claims, claw backs, suits, judgments and damages resulting from acts occurring prior to and after the termination of this Agreement. Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender as soon as any liabilities, claims, claw backs, suits, judgments, and damages arise and the following remedies will be immediately available to the Borrower: (1) Upon Borrower's first demand the Lender shall be required to pay all reasonable costs to remedy any liabilities, claims, claw backs, suits, judgments, and damages within ten (10) business days upon receipt the notice from the Lender to the Borrower. (2) In addition, Lender agrees to pay all reasonable costs to the Borrower's sole satisfaction.

**Amendments**

29. Changes to this Agreement will not be effective or binding unless in writing and signed by both parties to the Agreement.

**Termination of Agreement**

30. Borrower may terminate this agreement for any reason or no reason at all by giving the Lender at least ten (10) days' prior notice. If the Lender commits a breach of its obligations under this agreement, the Borrower may terminate this agreement by giving the breaching party at least ten (10) days' prior notice, except that any such notice will not result in termination if the breaching party cures that breach before the thirty (30) day cure period elapses. A breach of this Agreement includes, but is not limited to, the following: (1) Lender's failure to pay any amount, and (2) Lender's failure to timely deliver funds. If the Lender attempts to terminate this Agreement early, Lender agrees to pay attorney's fees and all costs on behalf of the Borrower. The Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Binding Arbitration**

31. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Delaware, before one (1) arbitrator in an expedited manner and without undue delay. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such

demand pursuant to the notice requirements set forth in Section 35 herein. Within sixty (60) days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, or this Agreement to arbitrate. All arbitration fees, including but not limited to administrative fees, arbitrator fees, and other expenses related to the arbitration proceeding, shall be paid by the Lender. In the event this section is ignored by either party, the affected party shall be immediately awarded any attorney's fees spent on compelling the arbitration.

**<u>Disclaimer of Liability</u>**

32. Borrower has no liability or obligation in connection with this Agreement and makes no warranties or representations in connection therewith. No claim may be made by the Lender or any other Person against the Borrower or the Affiliates, directors, officers, employees, attorneys or agents of the Borrower for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their

favor and regardless of whether Borrower has been advised of the likelihood of such loss of damage.

**Publicity**

33. Lender and Borrower shall have the right to issue periodic news releases and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld.

**Divisibility**

34. The invalidity of any one or more phrases, sentences, clauses, or section contained in this Agreement shall not affect the remaining portions of this Agreement, or any part thereof. Further, various headings included in this Agreement exist purely as an aid to locate particular wording, and do not in and of themselves in any way affect the substance of this Agreement.

**Notices**

35. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by certified mail:

To Borrower: Better Methods LLC

P.O. Box 60443

Jacksonville, Florida 32236

To Lender: Genie Investments NV

P.O. Box 60443

Jacksonville, Florida 32236

**Entire Agreement**

36. This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

**IN WITNESS WHEREOF**, the parties have duly affixed their signatures under hand and seal on this **SIGNED, SEALED, AND DELIVERED** this 3rd day of January, 2023.

John Michael Cohan on behalf of Better Methods LLC

Borrower

David Hughes on behalf of Genie Investments

Lender

Exhibit A

# BETTER METHODS

## Executive Summary

- **Company Overview**: "Better Methods" specializes in investments and asset management, offering innovative financial strategies and solutions to our clients. Our mission is to leverage unique market opportunities to provide substantial returns on investments.
- **Mission Statement**: To redefine wealth management through superior strategies, transparency, and client empowerment.
- **Objectives**: Achieve consistent, competitive returns while minimizing risks and educating clients on the investment process.

## Services

- **Investment Management**: Customized portfolio management tailored to meet individual investor goals and risk tolerance.
- **Asset Management**: Strategic asset allocation, performance monitoring, and rebalancing to optimize investment portfolios.
- **Risk Management**: Comprehensive risk assessment and management strategies to protect investments.

## Market Analysis

- **Industry Overview**: Analysis of current trends in investment and asset management, including market demands and competitive landscape.
- **Target Market**: Individual and institutional investors seeking innovative, risk-aware investment strategies.

## Marketing Strategy

- **Positioning**: "Better Methods" positions itself as a transparent, risk-aware investment firm that educates and empowers its clients.
- **Promotion**: Through digital marketing, seminars, and one-on-one consultations to build trust and demonstrate expertise in managing investment risks.

## Operations Plan

- **Management Team**: Experienced professionals in finance, risk management, and investment strategy.
- **Technology**: Utilization of cutting-edge software for portfolio management, risk assessment, and client reporting.

- **Client Service**: Dedicated support team for client inquiries, education, and engagement.

## Financial Plan

- **Revenue Model**: Fee structures including management fees based on assets under management and performance-based incentives.
- **Projections**: Detailed financial projections including revenue, costs, and profitability analysis.

## Risk Factors and Disclosures

- **Investment Risks**: Investments managed by "Better Methods" are subject to market risk, including the potential loss of principal. Clients should be prepared for the possibility that they may lose some or all of their investment.
- **Discretionary Spending**: "Better Methods" retains the right to allocate and invest funds at its sole discretion, following the strategic objectives outlined to clients. "Better Methods" also makes high risk investments including but not limited to stocks, bonds, and stock options from time to time as "Better Methods" sees fit in public companies listed on the United States Stock Exchange and the Chicago Board of Options Exchange.
- **Business Continuity Risks**: There is a risk that "Better Methods" could cease operations due to unforeseen circumstances, which may affect the management of client assets.
- **Failure Risks**: As with any business, there is a risk of total failure. This could result from market conditions, operational failures, or other unforeseen challenges.
- **Mitigation Strategies**: Includes diversification, continuous market analysis, and stringent risk management practices to mitigate the risks associated with investments and business operations.

## Conclusion

"Better Methods" is committed to transparency, risk management, and client empowerment. Our business model is designed to navigate the complexities of the investment world while providing clear, understandable pathways for our clients' financial goals. This plan outlines not only our strategy for success but also our commitment to honesty about the potential risks involved in investment and asset management.

# Exhibit F

# LOAN AGREEMENT

**THIS LOAN AGREEMENT (this "Agreement") dated this 1st day of June, 2023**

**BETWEEN:**

Genie Investments NV
(the "Lender")

**AND**

Genie's Angels LLC
(the "Borrower")

**IN CONSIDERATION OF** the Lender loaning certain monies (the "Loan") to the Borrower, and the Borrower repaying the Loan to the Lender, both parties agree to keep, perform and fulfill the promises and conditions set out in this Agreement:

**Loan Amount & Interest**

1. The Lender promises to loan up to $50,000.00 (Fifty Thousand Dollars and No Cents) in the form of a non-recourse unsecured line of credit to the Borrower and the Borrower promises to repay this principal amount to the Lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance. The loan amount can increase at any time if mutually agreed upon in writing by both Borrower and Lender. The Lender shall not have the ability to decrease the loan amount at any time.

**Payment**

2. This Loan will be repaid in the form of one (1) balloon payment due on June 1st, 2030.

3. At any time while not in default under this Agreement, the Borrower may pay the outstanding balance to the Lender without further bonus or penalty.

**Extension**

4. Lender agrees that Borrower has the sole right and decision making authority to be granted an extension of this Agreement for up to ten (10) additional years upon the request of the Borrower.

**Use of Funds**

5. Lender shall have no obligation to see that funds advanced under this Agreement are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for and sole discretion of the proper application of funds advanced pursuant to this Agreement. Proper application is to be defined as using funds in accordance with a Business Plan provided by Borrower attached hereto as Exhibit A. Lender fully understands the Business Plan provided by the Borrower. Lender agrees to indemnify the Borrower and hold the Borrower harmless for any risks associated the proper application of funds contained in the Business Plan.

**Borrower Default**

6. Notwithstanding anything to the contrary in this Agreement, if the Borrower defaults in the performance of any obligation under this Agreement, the Borrower will have one hundred twenty (120) days to cure the default.

**Borrower Default Lender's Sole Remedy**

7. Upon a Borrower Default, the sole remedy for the Lender is that the Lender and Borrower must negotiate a reasonable mutually agreed upon payment plan to pay off any accrued interest and outstanding principal. If a payment plan cannot be agreed upon within sixty (60) days from the date of the Borrower default, this dispute will be governed by Section 31 in this agreement.

**Lender Default**

8. The Lender will be in default if any of the following occur: (1) any attempt at early termination or acceleration of payments, (2) any change in control of Lender, and (3) violating any of the terms set forth in this Agreement.

**Exclusion from Voting**

9. Upon becoming a defaulting Lender, such Lender will lose its ability to vote on amendments, waivers and consents. In the event of a Lender default, the Lender shall be excluded from all decisions that require mutual consent.

**Fees Upon Lender Default**

10. While a Lender remains a defaulting Lender, Lender will no longer be entitled to receive any commitment fees that would have otherwise been payable.

**Improper Acceleration**

11. The Lender may not under any circumstance accelerate any amounts due under the loan.

**Insecurity Clause**

12. The Lender may not accelerate any amounts due under the loan if it feels insecure from the actions by the Borrower.

**Wrongful Interference**

13. Lenders shall not improperly exert undue control or interfere with the Borrower's contracts with third parties. If Lender improperly exerts undue control or interferes with the Borrower's contracts, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Interference with Management**

14. Lenders shall not improperly exert undue control or interfere with the Borrower's management team. If Lender improperly exerts undue control or interferes with the Borrower's management team, the Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Enforcement Costs**

15. All costs, expenses and expenditures including, without limitation, the complete legal costs incurred by enforcing this Agreement will be paid by the Lender.

**Governing Law**

16. This Agreement will be construed in accordance with and governed by the laws of the State of Delaware.

**Amendments**

17. This Agreement may only be amended or modified by a mutually agreeable written instrument executed by both the Borrower and the Lender.

**Severability**

18. The clauses and paragraphs contained in this Agreement are intended to be read and construed independently of each other. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

**General Provisions**

19. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**Assignment**

20. The parties further agree that this Agreement may be assigned or sold at any time by the Borrower at its sole discretion. The Lender may not assign or sell this Agreement without prior written consent and approval by the Borrower.

**Release of Mortgage/Security Agreement**

21. Not applicable.

**Life Insurance**

22. Not applicable.

**No Required Collateral**

23. No collateral of any kind is required by or part of this Agreement.

**No Personal Guarantee**

24. There are no personal guarantees requirements of any kind with this Agreement.

**Non-Recourse**

25. This is a non-recourse loan. The Lender shall have no recourse against the Borrower.

**Unsecured Loan**

26. This is a unsecured loan.

**Confidentiality**

27. Lender hereby agrees to maintain confidential this Agreement, and any information disclosed by Borrower related to the terms upon which funding of the loan is to take place. Lender's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Lender to pecuniary damages and any other remedies available to Borrower in law or at equity, including but not limited to injunctive relief. All such remedies are cumulative in nature.

**Indemnification**

28. The Lender shall indemnify, defend, and hold harmless the Borrower and its respective officers and employees from any liabilities, claims, claw backs, suits, judgments, and damages arising as a result of the performance of the obligations under this Agreement. The liability of the Lender under

this Agreement shall continue after the termination of the Agreement with respect to any liabilities, claims, claw backs, suits, judgments and damages resulting from acts occurring prior to and after the termination of this Agreement. Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender as soon as any liabilities, claims, claw backs, suits, judgments, and damages arise and the following remedies will be immediately available to the Borrower: (1) Upon Borrower's first demand the Lender shall be required to pay all reasonable costs to remedy any liabilities, claims, claw backs, suits, judgments, and damages within ten (10) business days upon receipt the notice from the Lender to the Borrower. (2) In addition, Lender agrees to pay all reasonable costs to the Borrower's sole satisfaction.

**Amendments**

29. Changes to this Agreement will not be effective or binding unless in writing and signed by both parties to the Agreement.

**Termination of Agreement**

30. Borrower may terminate this agreement for any reason or no reason at all by giving the Lender at least ten (10) days' prior notice. If the Lender commits a breach of its obligations under this agreement, the Borrower may terminate this agreement by giving the breaching party at least ten (10) days' prior notice, except that any such notice will not result in termination if the breaching party cures that breach before the thirty (30) day cure period elapses. A breach of this Agreement includes, but is not limited to, the following: (1) Lender's failure to pay any amount, and (2) Lender's failure to timely deliver funds. If the Lender attempts to terminate this Agreement early, Lender agrees to pay attorney's fees and all costs on behalf of the Borrower. The Borrower reserves the right to seek special, indirect, consequential or punitive damages against the Lender.

**Binding Arbitration**

31. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Delaware, before one (1) arbitrator in an expedited manner and without undue delay. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such

demand pursuant to the notice requirements set forth in Section 35 herein. Within sixty (60) days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, or this Agreement to arbitrate. All arbitration fees, including but not limited to administrative fees, arbitrator fees, and other expenses related to the arbitration proceeding, shall be paid by the Lender. In the event this section is ignored by either party, the affected party shall be immediately awarded any attorney's fees spent on compelling the arbitration.

**<u>Disclaimer of Liability</u>**

32. Borrower has no liability or obligation in connection with this Agreement and makes no warranties or representations in connection therewith. No claim may be made by the Lender or any other Person against the Borrower or the Affiliates, directors, officers, employees, attorneys or agents of the Borrower for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their

favor and regardless of whether Borrower has been advised of the likelihood of such loss of damage.

**<u>Publicity</u>**

33. Lender and Borrower shall have the right to issue periodic news releases and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld.

**Divisibility**

34. The invalidity of any one or more phrases, sentences, clauses, or section contained in this Agreement shall not affect the remaining portions of this Agreement, or any part thereof. Further, various headings included in this Agreement exist purely as an aid to locate particular wording, and do not in and of themselves in any way affect the substance of this Agreement.

**Notices**

35. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by certified mail:

To Borrower: Genie's Angels LLC

P.O. Box 60443

Jacksonville, Florida 32236

To Lender: Genie Investments NV

P.O. Box 60443

Jacksonville, Florida 32236

**Entire Agreement**

36. This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

**IN WITNESS WHEREOF**, the parties have duly affixed their signatures under hand and seal on this **SIGNED, SEALED, AND DELIVERED** this 1st day of June, 2023.

John Michael Cohan on behalf of Genie's Angels LLC
Borrower

David Hughes on behalf of Genie Investments
Lender

Exhibit A

GA | GENIE'S ANGELS

**Executive Summary**

Genie's Angels LLC is a financial services startup dedicated to providing innovative solutions for consumers seeking to efficiently manage and pay off their credit card debt. Leveraging proprietary technology and personalized service, we aim to offer tailored debt repayment plans that fit our clients' unique financial situations, thus enabling them to achieve financial freedom sooner. Despite the promising outlook, potential investors and lenders should be aware of the inherent risks associated with any financial venture.

**Business Description**

Genie's Angels LLC operates in the financial services industry, focusing on debt management and reduction services for individuals. Our mission is to empower consumers by providing them with the tools and guidance necessary to overcome credit card debt.

**Market Analysis**

Our primary market consists of credit card holders across the United States who are struggling with high interest rates and seeking effective strategies to manage and pay down their debt. With credit card debt in the U.S. reaching trillions of dollars, the demand for debt management solutions is significant and growing.

**Services Offered**

- **Debt Repayment Planning:** Personalized plans designed to optimize debt repayment and minimize interest costs.
- **Financial Counseling:** One-on-one sessions with financial advisors to help clients better understand and manage their finances.

**Marketing and Sales Strategy**

Our marketing strategy focuses on online channels, including social media, search engine optimization (SEO), and partnerships with financial advice platforms. Sales efforts will be directed towards online consultations and sign-ups, leveraging a user-friendly platform that facilitates engagement and conversion.

**Operational Plan**

Operations will be primarily online, with a headquarters based in Wilmington, Delaware for administrative functions and a small team of financial advisors. Technology development, maintenance, and customer support will form the core of our operational expenses.

**Management Team**

The management team comprises experienced professionals in finance, technology, and marketing, all dedicated to the mission of reducing consumer debt through innovative solutions.

**Financial Plan**

- **Start-up Costs:** Covering technology development, marketing, and initial operating expenses.
- **Revenue Model:** Income will be generated through service fees, subscription models, and commission from negotiated debt savings.

**Risks and Disclaimers**

- **Total Loss Risk:** Investors and lenders should be aware that their capital is at risk, including the possibility of a total loss. The volatile nature of the financial services industry and changing market conditions can significantly impact our operations.
- **Discretion in Use of Funds:** Genie's Angels LLC reserves the right to utilize any loan or investment funds at its sole discretion to support operational needs and strategic objectives.
- **Business Continuity Risks:** Like any business, there is a risk that Genie's Angels LLC may cease operations due to various factors, including financial insolvency, market dynamics, regulatory changes, or failure to compete effectively.
- **Failure Risk:** There exists the possibility that Genie's Angels LLC might not achieve its objectives and could fail completely, impacting its ability to return capital to investors or repay loans.

**Conclusion**

While Genie's Angels LLC presents an exciting opportunity to address a pressing financial issue faced by many Americans, potential investors and lenders should carefully consider the risks outlined. We believe in transparency and are committed to managing risks effectively to create value for our clients and stakeholders alike.