FILED MAIL USBC
JAX, FL SEP 23'25

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
In re: Genie Investments NV Inc., Debtor.
Case No. 3:24-bk-00496-BAJ
Chapter 7
Adversary Pro. No. 3:25-ap-00011-BAJ

## NOTICE OF OBJECTION REGARDING SELECTIVE ENFORCEMENT AND RETALIATORY ACTIONS

To the Honorable Court, the Chapter 7 Trustee, and all parties of record:

Please take notice that I, John Michael Cohan, submit this objection regarding the handling of fraudulent transfer claims and enforcement actions in the above-captioned bankruptcy proceeding, specifically with respect to CALD Holdings, LLC ("CALD") and my former entities.

1. Unequal treatment based on representation – CALD Holdings (dissolved) was allowed to resolve its involvement without further action once it retained counsel and demonstrated no potential for estate recovery. In contrast, my former entities (also dissolved) have been subjected to aggressive claims, defaults, and alleged fraudulent transfer accusations despite the absence of available legal counsel. This differential treatment is inequitable and punitive. CALD only became a subject of the Trustee's review after we highlighted that the entity had not been included in prior filings (Doc. 287, Page 16, Section VI) further demonstrating selective enforcement and reactive targeting.

2. Retaliatory pattern – The timing and nature of claims against my former entities indicate retaliation. Following my actions to hold previous attorneys accountable (Scott Oh) for reputational harm, the estate and associated parties pursued claims against us aggressively instead of engaging in discussions or settlement negotiations, despite our willingness to resolve matters off the record.

3. Failure to adjudicate pending motions – Our pending motion for sanctions against the Trustee remains unruled upon, as does a related suit being stayed. The Trustee's selective actions, including aggressive pursuit of claims against my entities while letting CALD resolve its involvement, highlight procedural inequities and unequal treatment.

4. Improper procedural actions and misrepresentations – The Chapter 7 Trustee and United States Trustee have manipulated audio recordings, made misrepresentations, and created unfounded confirmations. These actions have unnecessarily escalated disputes and triggered additional scrutiny from other enforcement bodies.

5.  No intent to obstruct estate recovery — We are not seeking to impede the estate or deprive creditors of legitimate recovery. This objection addresses improper, retaliatory, and procedurally flawed actions that disproportionately impact parties unable to retain counsel, while the estate allows other parties with counsel to exit proceedings without consequence.

Accordingly, I respectfully request that the Court:

- Take notice of the unequal and retaliatory treatment described herein.

- Consider these factors when evaluating future Trustee claims.

- Ensure that all actions and proceedings are conducted equitably, without targeting parties solely for lack of counsel, resources, or for exercising their First Amendment rights to redress.

Dated: 09-17-2025

Respectfully submitted in Good Faith,

John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103

Certificate of Service

I hereby certify that all interested parties have been duly served a copy of the following documents by the CM/ECF system.

## DECLARATION OF GENIE MANAGEMENT DAVID HUGHES, JOHN COHAN, & CALEB DAVIS

We, David Hughes, John Cohan, and Caleb Davis declare based on our personal knowledge that the following is true:

1.      We make this declaration of our own personal knowledge, except if and where stated on information and belief, and if called to testify in this proceeding on these matters could do so competently.

2.      We are the owners and officers of Genie Investments NV (Genie), the Claimant in the above-referenced Chapter 11 matter. We are personally knowledgeable about all aspects of Genie's history, operations, and finances.

3.      Since October 2022, we have been personally involved with negotiations, discussions, and written communications between Genie and Velanos Principal Capital (Velanos) – including persons acting on behalf of Velanos, concerning a Genie-Velanos joint venture.

4.      Genie Investments engaged Scott Oh of Warren Law Group to advise, conduct due diligence, aid in negotiations, discussions, and written communications between Genie and Velanos Principal Capital (Velanos) – including negotiating a safe Genie-Velanos joint venture agreement/contract.

5.      On or around October 10th, 2022, Will Byrd hosted a meet and greet conference call between Genie Investments management team, Scott Oh, and Velanos' principle Joshua Wearmouth. The purpose of this call was to connect Mr. Wearmouth to Scott Oh so that Scott could understand Velanos' business capabilities and offering. Velanos provided a first document draft of the JV agreement for all to review.

6.      Immediately after this introductory call on October 10th, Scott Oh told the Genie management team that he would start his due diligence and report back with his findings.

7.     A few days later, Scott Oh hosted a call with Genie's management team to discuss his findings. Scott Oh informed and advised the Genie management team of the following:

    a.  Scott Oh stated that after his industry research that Velanos and Joshua Wearmouth were "The Real Deal."

    b.  Scott Oh stated that he knew the gentlemen that Joshua Wearmouth syndicated for, but due to confidentiality, he could not divulge who this individual was.

    c.  Scott Oh stated that if we had any issues or trouble with the Velanos relationship, that his brother-in-law was a Barrister in London that could help us.

    d.  Scott Oh 100% confidently supported the validity of SBLC trading as a real long standing historical investment platform.

    e.  Scott Oh stated that our principal would never be at risk because it was 100% collateralized with the best asset available/possible which was a cash backed and bank guaranteed SBLC with our name as the beneficiary.

    f.  Scott Oh stated that the SBLC, for which Genie would be the beneficiary of, he himself, could liquidate in a matter of 1 day if we had any issue at all.

    g.  Genie management hosted one final call with Scott Oh whereby we asked if there was any possible way we could lose any principal sent to Velanos and Scott's reply was "no, because we would always have an SBLC that we would be the beneficiary of, in the event that Josh couldn't perform or deliver funds back to Genie.

    h.  Scott Oh then finalized the JV agreement with Velanos to include various

changes including legal venue being the state of NY.

    i.   Scott Oh then sent the final version of the JV agreement through docusign for Genie's signature.

8.    Genie and Velanos entered a Joint Venture Agreement (JVA) on or about October 20, 2022. A copy of the original JVA, which is attached as Exhibit 1 to this Declaration, called for Genie to contribute $3.0 million in capital to the joint venture. Genie made the required capital contribution immediately after the JVA took effect. The original draft of the JVA was provided by Joshua Wearmouth and Scott Oh, Warren Law Group, drafted changes to protect Genie Investments in all aspects.

9.    The JVA stated that Velanos would use the capital contributed by Genie to "manag[e] trades and transactions" and otherwise "structure" and "administer" the joint venture. Velanos's owner and principal, Joshua Wearmouth, had previously stated to me and Genie's two other principals, Caleb Davis and John Michael Cohan, that the trades and transactions referenced in the JVA would involve instruments called "standby letters of credit" (SBLCs). Wearmouth represented that his extensive experience and network of contacts allowed him to purchase SBLCs at a discount and immediately sell them at a substantial profit in pre-arranged trades. He asserted that this trading posed no risk of loss to Genie's capital.

10.    In mid-November 2022, Velanos proposed that Genie contribute an additional $3.0 million in exchange for an increase in Genie's total profit participation to $50 million. The parties agreed to these changes, which were memorialized in an "Amendment to Joint Venture Agreement" (1st JVA Amendment) that took effect November 21, 2022.

11.     Near the end of November 2022, Velanos again proposed that Genie contribute an additional $3.0 million in exchange for an increase in Genie's total profit participation to $66 million. Although these changes were not memorialized in a written amendment of the JVA, Velanos and its representatives subsequently acknowledged in correspondence that the total amount due to Genie under the JVA, as amended, was $75.0 million. In a letter dated December 30, 2022, for example, Wearmouth stated that "the $75,000,000.00 USD owed to you will be available on or before January 15th, 2023."

12.     On January 24, 2023, Velanos provided Genie with a screenshot of what appeared to be an email to Wearmouth from a person identified only as "Simon" regarding funds that Velanos ostensibly had on deposit with HSBC Bank in London.

13.     On January 27, 2023, Velanos provided Genie with electronic documents that appeared to show that Velanos had initiated a $10.0 million wire transfer from a ScotiaBank account to Genie's checking account at JP Morgan Chase.

14.     Genie never received the wire transfer referenced in the documents that constitute Exhibit 3. Wearmouth later asserted that the wire transfer was being held up by a correspondent bank, which he identified as Wells Fargo.

15.     In a letter to Genie dated March 24, 2023, Wearmouth asserted that its trading profits were "being held at HSBC, UK under a sub account..." He further claimed that Velanos would need to establish a "master" account with HSBC and that doing so would allow it to access the trading profits in the subaccount.

16.     On April 13, 2023, Wearmouth forwarded an email chain from two individuals regarding the establishment of a "Master TRA" at HSBC.

17.     As of June 2023, Velanos had not returned any of Genie's $9.0 million in capital

contributions or distributed any profits to Genie. Velanos blamed these failures on banks such as HSBC.

18.    In June 2023, Wearmouth proposed an amendment of the JVA that would, he said, solve the putative problem of banks preventing Velanos from paying Genie. The proposal, which the parties memorialized in a "Second Amendment to Joint Venture Agreement" (Second JVA Amendment),  was for Velanos to (1) "facilitate the opening of a commercial bank account" in Genie's name at Nordic Trust Alliance KB (Nordic Trust) in Miami, Florida, (2) deposit $9.5 million into Genie's Nordic Trust account on or before June 15, 2023, and (3) deposit an additional $50.0 million into Genie's Nordic Trust account on or before June 30, 2023.

19.    In accordance with the Second JVA Amendment, Genie submitted an account application to Nordic Trust. Shortly thereafter, Genie received notice that its Nordic Trust account had been established and that it had access to an online account portal (Portal). On June 20, 2023, the Portal showed that Velanos transferred $9.5 million into Genie's Nordic Trust account. On three subsequent occasions, Genie attempted to wire that $9.5 million or some portion of it to its checking account at JP Morgan Chase. None of the alleged balance ever transferred, however, and Nordic Trust never provided substantive responses to Genie's multiple requests for explanations and status updates.

20.    In October 2023, Genie's legal counsel sent a demand letter to Velanos asserting that Velanos was in material breach of the JVA, as amended, and that, as a result, it owed Genie at least $75 million. Wearmouth responded in a letter dated October 13, 2023,.

21.    As recently as November 1, 2023, Wearmouth sent several text messages asserting that Velanos had nearly $20 million in available funds in one bank account and that additional funds would soon become available.

22.    Between October 20, 2022, and the date of this Declaration, Velanos has returned only $500,000 of Genie's capital contributions and has distributed zero profits to Genie.

23.    As a result of Velanos's breach of the JVA, as amended, Genie has been and remains unable to fund loans to its borrower customers or to issue refunds to more than 20 customers who have demanded them.

This has placed Genie in extreme legal and financial jeopardy. As a direct result of Velanos's breach, Genie is facing one federal lawsuit, one regulatory inquiry, numerous additional potential legal actions and regulatory inquiries.

I declare under penalty of perjury under the laws of the state of Illinois that the foregoing information is true and correct. Executed this 12th day of March 2024, in Springfield, Illinois.

John Cohan
John Cohan (Mar 12, 2024 12:02 EDT)
_____
John Cohan

David Hughes
David Hughes (Mar 12, 2024 10:01 CDT)
_____
David Hughes

Caleb Davis
Caleb Davis (Mar 12, 2024 17:07 EDT)
_____
Caleb Davis

# Genie management declaration

Final Audit Report                                           2024-03-12

| | |
|---|---|
| Created: | 2024-03-12 |
| By: | John Michael Cohan (contact@capitulumhomes.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAHSORuGRvH_mrXtMDnWA01SF-t-Rmn9E7 |

## "Genie management declaration" History

📄 Document created by John Michael Cohan (contact@capitulumhomes.com)
2024-03-12 - 9:03:20 PM GMT- IP address: 108.90.31.105

📧 Document emailed to Caleb Davis (cdavis@genieinvestments.com) for signature
2024-03-12 - 9:03:25 PM GMT

📧 Document emailed to David Hughes (dhughes@genieinvestments.com) for signature
2024-03-12 - 9:03:25 PM GMT

📧 Document emailed to John Cohan (jmcohan@genieinvestments.com) for signature
2024-03-12 - 9:03:25 PM GMT

📄 Email viewed by John Cohan (jmcohan@genieinvestments.com)
2024-03-12 - 9:04:32 PM GMT- IP address: 108.90.31.105

✍ Document e-signed by John Cohan (jmcohan@genieinvestments.com)
Signature Date: 2024-03-12 - 9:05:03 PM GMT - Time Source: server- IP address: 108.90.31.105

📄 Email viewed by David Hughes (dhughes@genieinvestments.com)
2024-03-12 - 9:05:33 PM GMT- IP address: 73.8.128.106

✍ Document e-signed by David Hughes (dhughes@genieinvestments.com)
Signature Date: 2024-03-12 - 9:05:50 PM GMT - Time Source: server- IP address: 73.8.128.106

📄 Email viewed by Caleb Davis (cdavis@genieinvestments.com)
2024-03-12 - 9:06:55 PM GMT- IP address: 174.212.43.124

✍ Document e-signed by Caleb Davis (cdavis@genieinvestments.com)
Signature Date: 2024-03-12 - 9:07:49 PM GMT - Time Source: server- IP address: 174.212.43.124

✅ Agreement completed.
2024-03-12 - 9:07:49 PM GMT

 **Adobe Acrobat Sign**

# UNITED STATES BANKRUPTCY COURT

## MIDDLE DISTRICT OF FLORIDA

### JACKSONVILLE DIVISION

In re:

GENIE INVESTMENTS NV, INC.

        Debtor.

Case No.: 3:24-bk-00496-BAJ

Chapter 11

## DECLARATION OF ADAM B. WALKER

STATE OF MISSOURI

COUNTY OF JACKSON

The undersigned, ADAM B. WALKER, declares as follows:

1.  I, ADAM B. WALKER, am an attorney licensed to practice in Missouri. I am the owner and manager of Walker Law Office, LLC d/b/a AW Securities Law. I previously worked for more than 12 years as an enforcement lawyer for the Financial Industry Regulatory Authority (FINRA), where I routinely investigated fraudulent and potentially fraudulent investment activity.

2.  I began representing Genie Investments in or around July 2023 at the request of one of its owners, David Hughes. I had previously done legal work for another business in which Mr. Hughes also has an ownership interest. Before July 2023 I was aware that Genie existed and that it was in the lending business, but I had no other knowledge of or involvement with Genie.

3.  In July 2023, Genie asked me to help resolve a contract dispute between it and Velanos Principal Capital. I learned that Genie and Velanos had executed a "Joint Venture Agreement" (JVA) in October 2022 and subsequently amended it three times. Through conversations with

Genie's principals and review of the JVA and its amendments, I learned the essential terms of the agreement, which were:

- Genie and Velanos agreed to form a joint venture.

- Genie agreed to contribute $9.0 million in capital to the joint venture.

- Velanos agreed to use the $9.0 million capital contribution to buy and sell standby letters of credit (SBLCs).

- Velanos agreed to distribute profits from the SBLC transactions to Genie within 60 days of Genie's capital contributions.

- The JVA, as amended, stated that Velanos would return a total of $75 million to Genie, consisting of the $9.0 million capital contribution and $66 million in profits.

4.  As of July 2023, Velanos had not distributed any profits to Genie and had returned only $500,000 of its capital contributions. Velanos was, therefore, in material breach of the JVA.

5.  I also learned that Genie, shortly before executing the JVA, retained an attorney, referred to herein as "SO," to represent it with respect to what was then the "proposed joint venture" between Genie and Velanos. SO was and still is a partner with an established New York-based law firm.

6.  Almost immediately after talking with Genie about the Velanos transaction and reviewing the JVA, I strongly suspected that the SBLC-trading program offered by Velanos was fraudulent. With minimal research, I found numerous judicial opinions, press releases, and other materials supporting my suspicions. The U.S. Securities and Exchange Commission, Federal Bureau of Investigation, Federal Trade Commission, and U.S. Department of Treasury, in addition to other regulators and law-enforcement agencies, have in recent years issued warnings to the public about fraudulent prime-banking scams, including many involving fictitious SBLC trading.

7.  On or about July 24, 2023, I spoke with SO by telephone for approximately one hour to talk, among other things, about his review of the JVA, his knowledge of and experience with

2

SBLC trading, and whether he viewed the investments as potentially fraudulent or had any other reservations about Genie entrusting its capital to Velanos for the purposes described in the JVA.

8.  SO told me that he had extensive background with SBLCs, which he characterized as a legitimate investment used in "high level trade finance." He described SBLC trading as a "financing mechanism" that arose from the 1944 Bretton-Woods agreement, which created the World Bank and the International Monetary Fund.

9.  SO represented that Velanos, as promised, had used the $9.0 million in capital that Genie contributed to the joint venture to make profitable SBLC trades. SO acknowledged, however, that he had never received detailed information about any SBLC transactions that Velanos supposedly made.

10. I asked SO to describe how SBLC trading could generate massive profits in a matter of weeks. His response lacked detail. He stated only that it was a "rinse and repeat" process of buying SBLCs at a discount with ensuing profitable sales already prearranged. SO also repeatedly stated that there is "just a lot of leverage that's involved" or some variation thereof.

11. I asked SO if he was aware that SBLC trading was a frequent subject of fraud alerts and enforcement actions, both civil and criminal, by the federal government; he said that he was, but contended nonetheless that what Velanos promised Genie was not fraud. When I asked him how he knew that what Velanos promised was different from the numerous and well-publicized instances of fraud involving SBLCs, he stated that Velanos had "syndicated" the funds. He added, however, that he did not know the particulars of Velanos' ostensible syndication arrangement.

12. I have conducted extensive research into SBLC and other "prime banking" scams. In doing so, I learned that certain phrases, terms, and references are common among SBLC scams. The JVA contains several such phrases and terms. Likewise, SO described SBLC trading to me as

3

"royal-family type stuff" that happens every day, although not in the United States. According to SO, the U.S. government does not want its citizens involved in SBLC trading. Such assertions are often cited by law enforcement and regulators as markers of SBLC and other varieties of prime-banking fraud.

13. The JVA contains other "red flags" of fraud. For example, Velanos promised to generate an extremely high rate of return – more than 800% – in a matter of weeks. It is also, in my professional opinion, very poorly drafted, with some passages best described as gibberish.

14. Genie terminated its representation by SO and his law firm on or around July 24, 2023. On Genie's behalf, I requested all records from SO's representation of Genie. After several weeks' delay, SO provided what he described as the complete client file. That file, which I have reviewed, contains no documentation indicating that SO:

- conducted any meaningful investigation into Velanos, its principals, or its affiliates,

- noted any red flags in the JVA or any potential that the proposed investment was fraudulent,

- advised Genie of any appreciable risk of losing all or a portion of its principal, or

- mentioned to Genie that the transaction bore similarities to a well-known and heavily publicized type of investment fraud.

15. Based on my investigation and analysis of the JVA and my research into prime-banking fraud, I believe the SBLC trading Velanos promised to conduct with Genie's money was at all times fictitious and blatantly fraudulent.

16. Based on my communications with SO and my review of the client file obtained from him, I believe that SO's review of the JVA was inadequate; that he failed to conduct an appropriate and thorough investigation of the transaction, Velanos, and/or its principals and affiliates; and that, as a result, he likely did not discharge his professional obligations to Genie. For these reasons, it

is my opinion that Genie has a colorable claim against its former lawyer and law firm for professional malpractice. I am not equipped, however, to estimate any potential recovery if Genie were to pursue such an action.

17. Although many outside observers now impugn Genie's business judgment and competence for having invested in a fraudulent enterprise, it is critical to acknowledge that Genie did so only after receiving the advice of a licensed attorney from a well-regarded law firm, which it retained specifically to guard against placing its money in an illegitimate investment. Whatever one might say with the benefit of hindsight, the proper lens for evaluating Genie's competence to manage its affairs requires consideration of its entire operating history and the fact that it sought, paid for, and relied on the assistance of legal counsel that, by all appearances, had the experience and knowledge to advise it appropriately.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 14, 2024.

Adam B. Walker

WALKER LAW OFFICE, LLC d/b/a AW
SECURITIES LAW

5



John Michael Cohen - General Delivery
5455 Verna Blvd
Jacksonville, Florida 32256

US Bankruptcy Court
300 N Hogan Street 3-150
Jacksonville, Florida 32202